ALFRED CLARENCE BINGHAM v. STATE.

No. A-10483.   Jan. 23, 1946.
(165 P. 2d 646.)

6

Harold S. McArthur, of Tulsa, for plaintiff in error.

Randell S. Cobb, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, Alfred Clarence Bingham, was charged in the district court of Tulsa county with the crime of murder; was tried, convicted, and sentenced to death, and has appealed.

The information filed against defendant alleged that he killed his wife, Mary Bingham, on August 8, 1943, by cutting her throat with a sharp pocket-knife.

At the trial of the case, the killing of Mary Bingham was admitted by the defense and no evidence was offered or contention made that the homicide was excusable or justifiable, but the sole defense offered was that of insanity.

The defendant was a painter and paper-hanger by trade. He had been married to the deceased, Mary Bingham, for about 14 years. During their married life, the defendant had had periodic drunken sprees, and, on some occasions, it had become necessary for the deceased to take her three children and go to her mother's home in Tulsa, to secure food and clothing for herself and the children. In 1941, the deceased obtained a divorce from defendant on the grounds of extreme cruelty and habitual drunkenness of defendant, but they continued to live together thereafter as man and wife. About three months before the homicide, the deceased, together with her three children, moved into the home of her brother, who lived in the city of Tulsa. She went to work for the Douglas Aircraft Company at Tulsa, and was supporting herself and the children. During this three-month period, the defendant had been drinking heavily. On the few occasions when he saw the deceased, he would curse her, accuse her of infidelity, and had threatened her life. On Sunday evening, August 8, 1943, the defendant came to the home of the brother of the deceased and inquired for the deceased. Mrs. Rusher, mother of the deceased, told defendant that she had gone to the picture show and was not at the house, to which the defendant replied, "Oh, I know where she is— she is out with some man." The defendant had a knife in his hand at that time and told the Rushers that if the deceased came home with some man that he was going to kill her. At that time, little Jess Bingham, age 10, the son of defendant and deceased, came around the house to the defendant, and defendant took him by the hand and left.

Mrs. Rusher, sister-in-law of deceased, testified that about 30 minutes later she heard little Jess Bingham scream and that she and her husband ran to where he

was screaming. That they found the deceased, Mary Bingham, lying against the curb. Her throat had been cut and she was bleeding terribly. She died in a few minutes. The defendant was not present when the Rushers arrived at the scene of the homicide, but had fled. He was arrested three days later by a Tulsa policeman. After the defendant was taken to police headquarters, he gave a detailed statement concerning the crime, which statement was reduced to writing and introduced in evidence. The statement was quite lengthy and this opinion will not be burdened by quoting all of it. The statement was in question and answer form and was taken in shorthand and later reduced to writing and signed by the defendant. Some of the essential parts of said statement are as follows:

"Q. Now, on the evening, the early evening of August 8th, what had you been doing? A. I had been in whisky joints and beer parlors. Q. Do you remember what ones? A. Different ones. Q. How long had you been drinking that day? A. All day long. Q. You didn't work that day? A. No. Q. Had you seen your wife Mary earlier that day? A. No. Q. You knew where she lived at 713 W. 4th? A. Yes. Q. When did you first go to your wife's home? A. Along late in the evening. It was dark. Q. Your wife was not home then? A. I didn't see her. Q. Did you see your son? A. Yes. Q. Where? A. He came out and met me. Q. This is the only time you were at your wife's house that day? A. The only time that I know of. Q. When you went down to your wife's house, did you have a knife? A. I had a pocket-knife. Q. What kind of a knife as best you can describe? A. Either a two blade or a three blade knife. Q. Where did you get it? A. I found it in a pair of painter's overalls, about two weeks ago. Q. And you carried it from the time you found it? A. No, sir, not all the time. * * * Q. When you got up there to your wife's home and your little boy met you, did you have any conversation with him? A. It seems like that

I picked my finger nails with that knife. Q. Do you remember telling him what you were going to do to your wife if you found her coming home with another man? A. I have some faint remembrance of saying something to him but I do not know exactly what it was. Q. Do you remember telling your boy that you were going to rip her wide open if she came home with another man? A. I don't know whether I did or didn't. Q. How long had you been over there at your wife's house with your little boy before your wife came home? A. Off hand, I couldn't say. I'd been there talking for some time. Q. You were in the front yard there at 713 W. 4th when you first saw your wife coming toward the house? A. I was on the lawn there in front some place. Q. What did you do when you saw her coming? A. Seems like I met her down the street. Q. You still had your knife in your hand that you had been cleaning your finger nails with? A. I don't know whether I had it in my hand or had pulled it from my pocket. Q. Did you say anything to her as you met her? A. Seems like we had some words. Q. Do you remember what you said or what she said? A. No, I couldn't say that I did. Q. Do you remember slashing her with the knife at all? A. No, I cannot remember slashing her with the knife at all. I hit or cut her one or the other. I know that I did something to her, but don't remember what. Q. She fell to the ground, didn't she? A. I have a faint memory of her hollering or something like that and running backwards, and she fell and it flashed on me that something had happened. Q. When she fell did you go over to her again? A. No, I can't say that I did. * * * Q. You know that you did strike her or cut her and she fell? A. Yes, I know that. Q. Now, after you say that she had fallen to the ground, what did you do? A. I got away from there as fast as I could because she had told me that if I ever hit her she would have me arrested. Q. You knew you had done wrong and you wanted to get away from there before you got arrested? A. Yes, it dawned on me that I had done something and I wanted to get away fore I got arrested. Q. Did you run when you

left there? A. I ran some place and when I woke up the next morning, I was down there on the tracks, but where I went in the meantime, I don't know. Q. What portion of the tracks were you on? A. Sand Springs trolley tracks. Q. What station? A. I don't know but I'll take them down there and show them where it was. Q. Did you have the knife when you woke up the next morning? A. No, I must have lost it or dropped it or threw it away. Q. About what time did you wake up the next morning? A. I don't know, the sun was up. Q. Was there blood on your clothing? A. No, sir. * * * Q. After you woke up here on the tracks the following morning, where did you go and what did you do? A. Over to Newblock Park. Q. Did you see anyone you knew? A. I stopped and talked with a fellow over on Edison. * * * Q. What did you do the afternoon of the 9th of August, the next day after this thing happened? A. I went to look after a paint job. * * * Q. Where did you spend the night of August 9th? A. I slept out on the top of the hill, just out in the open. A fellow gave me a drink of whisky. I don't know who he was. I met him out there on Union Street. * * * Q. Now on August 10th, what did you do that day and where did you stay? A. I went up to Avant and stayed until yesterday. Then I came back. Q. What did you do in Avant? A. I stayed there after drinking beer in a beer parlor and then dozed off outside. Q. What time did you start back to Tulsa from Avant? A. Sometime yesterday. I thumbed a ride. Q. Did you ride with someone you knew? A. No, just hitched a ride. Q. Did you come right back to Tulsa? I mean from Avant? A. No, I stopped in Sperry, or I was put out of the car in Sperry, and then I walked the highway and started up what I thought was Cincinnati, but got on the wrong road. I had read the papers and everything and if I had done wrong, I wanted to find out about it. Q. When did you first read the papers? A. Tuesday, I think. Q. Then you read that your son had made a statement that you had threatened to rip your wife wide open and that he said that you had threatened her life? A. Yes, I read that. * * * Q. Where

did you spend Wednesday night? A. Well, that was last night and I spent it out there in the hills on the way to Tulsa. Q. Then this afternoon you went to Mr. Williams' house? A. Yes, That is Jess Williams in Carbondale. * * * Q. The officers came out to Williams' house and arrested you, is that right? A. Yes, I was eating supper and had just got through when they came. * * * Q. Now, on the night of August the 8th, you had been drinking? A. Heavy all day. Q. This statement that you have made here, these questions and answers. We have not threatened you in any manner or promised you anything. You have given us these answers voluntarily? A. Yes, you have been nice about everything."

Jess Bingham, ten-year-old son of the parties, testified that on the night of the homicide he walked from the Rusher's house up the street a short way with the defendant. That they sat down near the curb. That he went to sleep and laid his head over on his father's lap. That when he was awakened, his mother was just about a foot away; that the defendant jumped up with a knife in his hand. That his mother stepped backwards a step or two and the defendant stuck the knife in her neck. That his mother screamed and fell near the curb and the defendant turned and fled.

The defendant did not testify, but his brothers and other relatives and friends who had known him for many years testified concerning his mental condition. There was no contention made at the trial that the defendant was presently insane, but all of the defense was based on the theory that the defendant was insane at the time of the commission of the offense. This issue was properly presented to the jury by the court's instructions.

After motion for new trial was overruled and judgment and sentence pronounced, an appeal was taken to this court. Counsel for defendant filed a brief in sup-

port of the appeal and the case was assigned for oral argument. At the time of oral argument, counsel for defendant was quoting some of the testimony of the defendant's witnesses, in which some of them had stated that defendant had always been irrational, or "was not right," or "was not mental-minded," at which time one of the members of this court asked counsel for defendant whether the question of present insanity had been raised at the trial and counsel for defendant stated that it had not been raised, but asked permission of the court to file a supplemental brief presenting to this court the question as to whether the court erred in failing of its own motion to empanel a jury to try the issue of the present insanity, after the testimony of the defendant's witnesses showed that there was a doubt as to the defendant's present sanity. This request of counsel for the defendant was granted and a supplemental brief presenting this issue was filed and a response to the supplemental brief has likewise been filed by representatives of the state. This permission was granted because of the rules of criminal procedure adopted by this court whereby it has been held that, in a capital case, all errors alleged to have been committed during the trial of the defendant will be considered whether such assigned errors were presented to the lower court or properly raised by motion for new trial. Johnson v. State, 79 Okla. Cr. 363, 155 P. 2d 259.

The first assignment of error in defendant's brief is that the verdict is contrary to the evidence. In that connection, counsel for defendant state that the proof of both the state and the defendant conclusively shows that the defendant was insane at the time of the commission of the alleged crime. In presenting this assignment of error, counsel for defendant asserts the proposition that

the hypothetical question asked the state's witness, Dr. Ungerman, on rebuttal, did not present sufficient facts to afford grounds for a reasonable conclusion in that it failed to recite evidence in the case which was favorable to the defendant, but that the hypothetical question as propounded by counsel for the state was indefinite and improper.

The hypothetical question asked the witness by the county attorney was quite lengthy, covering six pages of the record. The record discloses that counsel for the defendant was given full opportunity to state any objections he had to the question as propounded by the county attorney, and at the suggestion of counsel for the defendant, additional facts were included in the hypothetical question. After counsel for defendant had suggested additional facts which he thought should be taken into consideration in propounding the hypothetical question and such additional facts had been included in the hypothetical question, the record discloses the following statement addressed by the court to counsel for the defendant:

"Q. Is there anything else you can think of, Mr. McArthur? Mr. McArthur: No, sir. By the Court: All right, proceed with your question."

An expert witness is one possessed of scientific knowledge acquired by study or practice or by both study and practice. Ordinarily, an expert is considered as a person who has experience and knowledge in relation to matters which are not generally known to the people. Where it is desired to introduce the testimony of an expert as to matters not coming within his personal knowledge, a hypothetical question should be asked the witness, and this question should be based upon and so framed

as to include and be responsive to the entire testimony in the case and none other, and thereby make it applicable to the issues before the jury. Miller v. State, 9 Okla. Cr. 255, 131 P. 717, L.R.A. 1915A, 1088; Brown v. State, 9 Okla. Cr. 382, 132 P. 359.

Expert testimony is admitted because the witness is supposed, from his experience and study, to have peculiar knowledge upon the subject of inquiry which jurors generally have not, and is thus supposed to be more capable of drawing conclusions from facts and basing opinions on them than jurors are presumably supposed to be. For this reason, it is important in propounding a hypothetical question to include therein all of the relevant facts in evidence before the jury, so that the opinion of the expert will properly be based upon the issues before the jury. The weight and credibility of the opinion of an expert is a question for the jury to determine, and, if such opinion is not well-founded, this may be shown by cross-examination.

We have closely read the hypothetical question propounded by counsel for the state. It substantially covers all of the material facts before the jury. It is true that, as pointed out in the brief of the defendant, there are statements by some of defendant's witnesses which were not included in the hypothetical question. These statements, however, were cumulative and were mostly statements of conclusions by witnesses as to defendant's mental condition and were not statements of facts. It is not necessary in presenting a hypothetical question to include the opinion of witnesses, but facts related by witnesses from which their conclusions are formed should properly be included in the hypothetical question. It is not expected that an examiner in presenting a hypothetical question should review in minute detail all of the

evidence which has been introduced. It is sufficient if it substantially gives all of the relevant testimony, so that the expert will have before him the facts substantially as they have been presented to the jury. As hereinabove shown by the statement of counsel for the defendant to the court, counsel for the defendant could not think, at the time the question was asked, of any facts which should have been included in the hypothetical question other than the ones which were included. It is evident from an examination of the record that counsel for the state had given much thought to the preparation of the hypothetical question. It had been reduced to writing and was full and complete enough to fairly present the substantial facts in evidence before the jury to the expert, as a basis for his opinion.

Under the evidence of the defendant, it was shown that the defendant had a child born by his first wife who was abnormal. That he had two brothers who had been committed to an insane asylum and that one of them died in such an institution. That the defendant had an older sister who committed suicide in Chicago, and the coroner's report, which the court allowed to be introduced in evidence, recites that the act was committed while she was in a state of insanity. It was also shown that defendant had an aunt on his father's side who was adjudged insane in the State of Ohio. However, the issue of insanity at the time of the alleged commission of the crime was properly presented to the jury. There is no complaint against any instruction given upon this issue. Under the evidence of the witnesses for the state, including that of the expert psychiatrist, the defendant was sane. Under the evidence of many of the witnesses for the defendant, the defendant was suffering from chronic alcoholism and an inherited mental

weakness which produced spells of delusions and insanity. From such evidence, the jury formed its opinion that the defendant was sane at the time of commission of the homicide and such finding should be binding upon an appellate court.

Complaint is made of certain statements of the county attorney allegedly made in his argument to the jury. All that the record discloses in connection with this assignment of error is as follows:

"And thereafter, to-wit, on the 8th day of October, 1943, at 8:30 o'clock P.M., during the argument of counsel for the state, to the jury, the following record was made:

"The Court: Dictate into the record your objection, Mr. McArthur.

"Mr. McArthur: Counsel just stated that nobody ever tried to get him declared insane prior to the institution of this case, nobody ever tried to have anything shown about his sanity as far as he could learn in the record of this case, and we object to that statement as being unwarranted, prejudicial, and we ask the Court to strike the same from the deliberation of the jury at this time.

"The Court: Overruled. And I want to say this, gentlemen, counsel has a right to draw his conclusions from the testimony and draw his own deductions from the testimony and argue the testimony to the jury, but the jury will have to take the testimony and the evidence in this case from the witness stand, not from counsel, and if the counsel were to misquote any evidence in the case, then the jury will take the evidence and not the statement of counsel. That goes for either counsel. With that statement, I overrule your objection and motion to strike. Mr. McArthur: We except to the ruling of the Court."

It is true that the defense witness, Dr. Smith, testi-

fied that he had advised defendant's wife and mother to have him committed to a hospital for treatment. As stated above, some of the witnesses for defendant testified concerning a family history of insanity and also about acts of the defendant which it was contended showed that he had a mental weakness. It was proper, therefore, for the prosecuting attorney, on cross-examination, to inquire as to whether any steps had ever been taken to have the defendant adjudged insane and committed to an institution for treatment, and this was, likewise, a proper subject of comment in the argument to the jury.

It was also alleged in the motion for new trial that the county attorney in his closing argument referred to the defendant as a "no-good, drunken bum." That the prosecutor further stated: "If this isn't a case for the electric chair, then someone ought to tell the warden to chop it up into toothpicks for the boys to use down there." And that the county attorney, also, stated, "As soon as the state found out what the defense would be in this case, we brought what we considered the best psychiatrist within 500 miles to testify to the defendant's sanity."

If these statements were in fact made by counsel for the state, the attorney for the defendant did not attach enough importance to them at the time they were made to interpose an objection or to have such statements incorporated in the record by the court reporter. The only way they appear in the record is through a statement of counsel for the defendant made to the court in support of his motion for new trial. Assuming for the purpose of disposition of this question that such statements are true excerpts from the argument of the county attorney, still, we do not believe that they are so improper as to require a reversal or modification of the

judgment. It would have been better if the entire argument of the prosecutor had been incorporated in the record. This court, then, could have known exactly what was said in the argument and how the statement purportedly made by the prosecutor fitted in with the balance of his argument. It is difficult for an appellate court to look at one isolated statement plucked from an argument and say that that statement by itself is so prejudicial as to cause a reversal. Enough must appear in the record to enable the court to determine from an examination of the entire argument whether the particular statement complained of is prejudicial and improper. A court should be liberal in allowing counsel for both the state and the defendant to present his argument. However, the arguments should not be presented in such a way as to confuse the jury as to what is argument of the prosecutor and what is evidence for their consideration. For that reason, we have held that it is improper for the prosecutor to state his personal opinion as to defendant's guilt. Thurmond v. State, 57 Okla. Cr. 388, 48 P. 2d 845.

It is next contended that the verdict is excessive and that a review of the entire record will show that the jury was working under a strain imposed by the trial judge who worked them late hours in an effort to finish the case before Sunday. The question of procedure to be followed during the trial, including the time of starting and recessing each day, is necessarily a matter resting in the sound discretion of the trial court, and, before this court would interfere to set aside a verdict because certain of the evidence had been received at a night session, there must clearly be shown that such action of the court resulted prejudicially to the defend-

ant and constituted an abuse of judicial discretion. Such is not shown by the record herein.

We now consider the most important question presented by this appeal. In the supplemental brief of the defendant, it is contended that the trial judge owed a duty, after hearing the testimony from various of the witnesses for the defense, to stop all trial proceedings and empanel a jury on his own motion to inquire into the present sanity of the accused. It is admitted that counsel for defendant never at the beginning of the trial, nor during the trial, nor at the close of the trial, nor at any other time, ever raised this question by motion or by any suggestion of counsel for the defendant. It was not one of the assignments of error attached to the case-made, but, as was herein above pointed out, it arose because of a question asked counsel for defendant by a member of this court at the time the case was assigned for oral argument.

22 O. S. 1941 § 1162, provides:

"When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to ·be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the fact."

It has been held that the doubt of defendant's sanity mentioned in said action may arise in the mind of the court on application for a continuance, motion for a new trial, motion in arrest of judgment, by ex parte affidavit or declaration of a bystander, or the court on its own motion; and, while the court cannot act arbitrarily in the matter, it has the right to look to the source of the information and come to a proper conclusion from all

of the facts and circumstances, whether there is a doubt in his mind as to the sanity of the defendant. He may also consider in that connection the fact that the question of insanity was never raised. Tuggle v. State, 73 Okla. Cr. 208, 119 P. 2d 857; Johnson v. State, 73 Okla. Cr. 370, 121 P. 2d 625; Signs v. State, 35 Okla. Cr. 340, 250 P. 938.

In all cases where such question has been presented to this court, there was a request, either at the beginning of the trial or before judgment and sentence was pronounced upon the conviction, that the court empanel a jury to try the question of the defendant's present sanity. In no case, so far as we know, has this issue been presented on appeal in the absence of some request made to the trial court for an inquiry into the defendant's sanity.

There is some language in the opinions of this court which lend support to defendant's position. We refer to the statement set forth in the case of Marshall v. Territory, 2 Okla. Cr. 136, 101 P. 139, 142, which quotes from the case of People v. Lee Fook, 85 Cal. 300, 301, 24 P. 654, and which statement is later quoted in other cases, and is as follows:

"If there exists in the mind of the court a doubt as to the sanity of the defendant, and this doubt arises at any time during the trial, it is the duty of the court to stop the trial, and have determined the sanity of the defendant before further proceeding."

However, our statute was adopted from the Dakota Code and not from the Penal Code of California. The California Code specifically provides when an indictment is called for trial, *or any time during the trial,* or when

the defendant is brought up for judgment on conviction, if a doubt arises as to the sanity of the defendant, the court must order the question of his sanity to be submitted to the jury. Section 1368, Part 2, Title 10, chapter 6, Penal Code 1941.

Our statute herein above quoted, unlike the California statute, provides for a trial of the question of present sanity under two conditions: First, when the indictment or information is called for trial, and, second, when, after the conviction, the defendant is brought before the court for the pronouncement of judgment. There is no provision for such a trial after a defendant has announced ready for trial and a jury has been empaneled. Under the California statute, a provision is set forth in the statute with reference to the disposition of a jury where the doubt of defendant's present sanity arises during the trial, in order to prevent a plea of former jeopardy being interposed at a second trial. There is no such provision in the Oklahoma statute, and, if contention of counsel for defendant were correct, that it was the duty of the trial court, where a doubt of sanity arises during the trial, to halt the trial and empanel a jury to determine the question of defendant's present sanity, and the trial judge of his own motion should dismiss the jury then empaneled to try the defendant upon the question of his guilt or innocence of the crime charged, it would appear that if a defendant should be adjudged sane and later brought to trial, he could enter a plea of former jeopardy. Other questions would, also, arise which to our minds show that it was not the intent of the Legislature to provide for the stopping of a trial and the empaneling of a jury to try the issue of present sanity. Suppose that the court holds a trial jury together and, after a trial on the question of sanity, the jury hearing

that matter decides the defendant is insane, would the trial on the merits be postponed for an indefinite period and the jury held together until the defendant discharged from the asylum? Such procedure would almost have to be followed or defendant could plead former jeopardy and prevent any further prosecution.

We adopted our section of the statute here involved from Dakota in 1890. This section appeared as section 7567, Compiled Laws of Dakota, 1887. Said chapter of the Dakota Code bears this title: "Inquiry into the Insanity of the Defendant Before Trial or After Conviction." The wording of this Title certainly makes its meaning evident.

The next question then arises as to whether, under the evidence before the court and in the absence of a request from defendant's counsel, the trial court should of its own motion have empaneled a jury before pronouncing judgment on the conviction to determine the issue of defendant's present sanity.

Before a trial court empanels a separate jury to try the issue of defendant's present sanity, under the statute, a doubt must arise in the mind of the court. It is true that the court may of its own motion in the exercise of sound discretion, in the absence of a request from defendant's counsel submit the question of defendant's sanity to the determination of a jury, but the existence of a doubt as to defendant's sanity must arise from facts and circumstances of a substantial character. In other words, there must exist reasons to believe that the claim of insanity made on behalf of the accused is genuine and not simulated as a means of defeating or delaying the law's penalties in cases where all other means of evading punishment would seem hopeless. The fact that able

counsel for defendant does not request a trial of the issue of the accused's present sanity would certainly weigh heavily with the court in determining whether there is a doubt of defendant's present sanity.

The contention of counsel that sufficient facts had been brought to the court's attention to raise a doubt as to the defendant's sanity is based upon conclusions of some of the witnesses for the defendant. These witnesses, mostly members of the family of the defendant, made the following statements:

"I certainly never found him responsible in any way."
"He never has acted too good at any time."
"He has not been normal most of his life."
"He always looked awful wild."
"I thought he was insane."
"He always acted peculiar."
"I believe he has always been crazy."
"He always acted different."
"He was never responsible."
"He was insane at times and erratic."
"He has grown worse year in and year out and talking crazier."
"He always talked wild and had a silly giggle."
"He acted irrational when he was drinking."

These are statements of opinion and very few facts are given by the witnesses which would justify the forming of such conclusions.

It is true as argued by counsel for defendant that, if the defendant is actually insane, and a doubt has arisen in the mind of the court, counsel for defendant cannot waive inquiry as to the question of defendant's sanity. Signs v. State, supra.

The conclusions of the witnesses herein above stated and all of the testimony on behalf of the defendant was for the purpose of laying ground work in support of his plea of not guilty by reason of insanity at the time of the homicide. The statements of witnesses that he would act irrational at times and the testimony concerning a family history of mental weakness were all introduced in evidence by counsel for defendant to bolster his claim that the defendant was insane at the time of the commission of the homicide. Frequently, we see such testimony introduced in cases to support the claim of temporary insanity at the time of the alleged commission of the crime. Since counsel had not requested a separate trial on the question of the defendant's present sanity, but was resting his case solely upon the question of defendant's insanity at the time of the commission of the alleged crime, the court was justified in concluding that there was no sufficient basis for the establishment of a doubt in his mind as to the defendant's present sanity. Although defendant did not testify, he was present during all of the proceedings and the trial court had an opportunity to observe his demeanor during the trial. Under such circumstances, we cannot sustain the contention of counsel that the failure of the court to empanel a jury to try the issue of defendant's present sanity in the absence of a request therefor was an abuse of judicial discretion.

If the defendant is insane or has become insane since his incarceration in the penitentiary (neither of which has been suggested to this court), the law has provided ample safeguards to fully protect him from punishment and to make an inquiry into his mental condition.

22 O. S. 1941 § 1005 provides a method for an inquiry into the sanity of a prisoner in the penitentiary

where the warden has reason to believe that he may be insane or that his mental condition is such as to justify an inquisition. The Governor of the state, likewise, has power to appoint expert alienists to observe the defendant and make an inquest into his sanity and, in this case, we recommend that such action be taken by the Governor before carrying out the execution of his sentence.

The case is affirmed.

The original time for execution having passed owing to the pendency of this appeal, it is considered, ordered, and adjudged, that the judgment and sentence of the district court of Tulsa county be carried out by the electrocution of the defendant on Thursday, April 11, 1946.

BAREFOOT, J., concurs. DOYLE, J., not participating.