Jose **GONZALES**, Plaintiff in Error,

v.

The **STATE** of Oklahoma, Defendant in Error.

No. A–13355.

Court of Criminal Appeals of Oklahoma.

Jan. 8, 1964.

Louie Gossett, Alan B. McPheron, Durant, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Charles L. Owens, Asst. Atty. Gen., for defendant in error.

JOHNSON, Presiding Judge.

The plaintiff in error, Jose Gonzales, hereinafter referred to as the defendant,

was charged in the district court of Bryan County with the crime of murder; was tried, convicted, and pursuant to the verdict of the jury sentenced to serve the balance of his natural life in the State Penitentiary. Appeal has been perfected to this Court.

The State proved that Denny D. Impson, the father-in-law of the defendant, was killed by defendant on September 5, 1962. A statement of the evidence becomes necessary.

The deceased and his wife Manota Impson lived in the country a short distance from Bokchito, in Bryan County. Their daughter who had been working in New Jersey returned to their home, and a few days later, on May 18, 1962 the defendant came from New Jersey to their home. On May 23, 1962 the deceased, his wife and daughter, and the defendant went to Paris, Texas, and the daughter and defendant were married. Soon thereafter the Impsons or some relative of theirs, found employment for the defendant at Pawhuska, Oklahoma, and he and his wife went there to live. The Impsons subsequently visited them a couple of times, and on the second trip Mr. Impson remained in Pawhuska with his daughter, and Mrs. Impson returned to their home. After about two weeks Mrs. Impson went back to Pawhuska to bring her husband home. On July 14, 1962, after the defendant had gone to work, the Impsons left Pawhuska, taking their daughter and her personal belongings with them.

The State introduced the testimony of seven witnesses.

A taxi driver testified that he picked the defendant up in Durant at 10:15 the night of September 5, 1962 and took him to a cross-road outside the town of Bokchito.

Mrs. Impson testified that her home was less than a quarter of a mile from the cross-roads where the defendant got out of the taxi. That she had not known defendant until he came to her home on May 18, 1962. She testified about visiting her daughter in Pawhuska and bringing her home, and that the daughter secured employ-

ment at the Bryan Memorial Hospital. Her hours were from 11 o'clock p. m. to 7 o'clock a. m.

Mrs. Impson stated that on the afternoon of September 4, 1962 the defendant appeared at their home and stated that he came to tell them good-bye, and asked for a drink of water, then left. That she and her husband took their daughter to work on the night of September 5 and remained at the hospital until 11 o'clock, then drove home, a distance of some 18 miles. That they had an electric lantern on the front porch, and left it burning, but as they drove up they saw that the light was out, and later found that the wires had been cut. Mrs. Impson was driving, and when they turned into the drive-way the car lights shown on the porch, and she saw the defendant getting out of a chair; that he started coming toward them, and immediately fired a gun, the shot passing through the glass of the car door on the driver's side, and striking her in the side of the face. That her husband quickly got out of the car and asked the defendant to "let's talk this over", but defendant walked around from her side of the car to the back, and started shooting, and her husband fell. That he then came to her side of the car, opened the door and grabbed her by the hair and asked her, "Old lady Impson, are you dead? If you're not you will be", and shot her again, this bullet going through her hand and and lodging in her purse. That he went back towards the house, and after things became quiet she raised up and saw the defendant sitting in a chair under a tree, and he was smoking—she could see the light of the cigarette. That he started back to the car and she laid down in the seat, and he grabbed her hair again and asked, "Are you dead?" and shook her around. She made no move, and he slammed the door of the car, and in a short while she raised up and saw a light in the house, got out of the car and ran to the nearest neighbors and asked them to call the officers.

B. L. Williams, deputy sheriff, testified that he received a call at 11:50 the night in

question to come to the Impson place. That he and the sheriff left Durant and when they reached Bokchito they picked up the town marshal and proceeded to the Impson home. When they arrived they found the defendant sitting under a tree in the yard with a gun in his hand. When ordered to throw the gun down, he complied, and witness searched him and placed handcuffs on him. That Mr. Impson was dead, lying on the ground near the front of his car. They picked up another gun near his body which was loaded, but none of the bullets had been fired. This witness stated that the gun he took from the defendant was a 9-shot .22, and contained 9 loaded shells. He found 7 or 8 empty shells near the back door of the house. He and the sheriff took the defendant to Bokchito and placed him in jail, leaving the town marshal at the Impson home. He secured an ambulance and they went back for the body.

Bill Templeton, sheriff of Bryan County, corroborated Mr. Williams, and also testified that they found a pint bottle of Old Crow whiskey one-third full sitting on the ground near the defendant.

Bill Cathey, town Marshal of Bokchito, corroborated the other officers, and all three testified that the defendant had been drinking when arrested, but they did not consider him drunk at that time. All three testified that he was very drunk an hour and a half or two hours later when he was transferred from the Bokchito jail to the county jail at Durant.

Dr. Robert E. Engles testified that he examined the body of the deceased about ten o'clock the morning of September 6, and found a total of eleven penetrating wounds in the body, caused by small calibre bullets; six wounds in the head, two in the front and one in the left side of the skull, and three penetrating the back of the skull; and found five bullet wounds in the back in the chest area. He testified that any one of the bullets could have caused death.

The defendant first called the county attorney, and inquired about the bottle of whiskey found at the Impson residence, and about the condition of the defendant as to being intoxicated. Witness testified that it was an hour and a half or two hours after the homicide when he saw the defendant, and that he was very drunk at that time.

Dr. Engles was called by the defendant, and the following hypothetical question was propounded:

"By Mr. McPheron: Doctor, I will ask you a hypothetical question: Assume that the defendant, Jose Gonzales, is a male of Puerto Rican descent, 23 years old, that he had been happily married, that his mother-in-law and father-in-law had taken their daughter, his wife, away from him and had not let him know that she was leaving, and that subsequent thereto his wife filed suit against him for divorce; that the divorce suit was filed against the defendant on July 24, 1962 and that the defendant was not notified of the same until September 4, 1962, and that the deceased and his wife refused to allow the defendant to talk with his wife, either by telephone or in person, and had directed him to stay away from their home; and that on the night of September 5, 1962 the defendant was waiting on the porch of the deceased's house for an opportunity to see and talk with his wife; and that the deceased got out of his car with a revolver in his hand gesturing toward the defendant and that the defendant shot the deceased 11 times, some of the shots entering from the front and some from the back, as you have testified; that he shot the wife of the deceased in the cheek and in the hand and later went to her on two occasions pulling her hair and saying, 'Old lady Impson, are you dead? If you are not, you soon will be.', and after this occurred the defendant was found sitting beneath the tree with his head down, approximately 9 or 10 feet from the deceased, with a gun in his hand and a whiskey bottle approximately one-third filled sitting on the ground beside him; the defendant

having been found in this place some hour after the shooting occurred, in your professional opinion, would you say that this defendant was temporarily deprived of his reason, and that at the time of committing the act of shooting the deceased and the deceased's wife that he was incapable of knowing right from wrong and incapable of knowing the wrongfulness of these acts? A Well, I think certainly the circumstances that you stated in the question that the defendant could have been temporarily insane at the time of the action. I don't—I don't think that I could definitely say that he was or was not. I think it is certainly a possibility.

"Q Doctor, assuming all those—all of this statement to be true, is it your professional opinion that in all probability the defendant was temporarily deprived of his reason? A Well, I would think if the statements were true that he made to the deceased's wife and his action as you state in the question at that time, I would think certainly that—that it's logical he would be temporarily deranged at the moment.

"Q These acts occurred. A Of these acts—that these acts occurred.
* * *
"Q Doctor, what do you mean by temporarily deranged? A Well, I mean that it is quite possible that in the emotions of the period of time he might not have known exactly what he was doing.

"Q Would he know right from wrong —if he were temporarily deranged? * * * A If he were temporarily deranged it is certainly possible that he would not know right from wrong."

The defendant took the stand in his own behalf, testified that he was 23 years of age, that his home was Puerto Rico and he had been in the United States since 1952; that he met his wife in New Jersey a year and a half prior to coming to Oklahoma, that they worked in the same factory there, that she left and came to Oklahoma,

and then he came down and they were married in Paris, Texas; that they went to Pawhuska where he worked for a construction company. He testified about his wife's parents visiting them in Pawhuska and returning from work and finding his wife gone. That he tried to telephone to her many times, but was unable to talk with her. That he went to Durant September 2nd or 3rd for the purpose of seeing his wife. That he went to the Impson home on September 4 and asked about his wife, but her parents would tell him nothing, and he left. He testified about taking a taxi out the next night, and when he found no one at home he sat down on the porch and waited for them to return. He testified:

"A They come and they stop the car and I say 'Hello', and I start walk off of the porch and by that time my father-in-law was out of the car already, so he shot me.

"Q He what? A He shot me.

"Q Then what happened? A I don't remember nothing else. All of what I know, sir, when I wake up I was here in jail."

He further testified that Mr. Impson shot one time, but did not hit him. (The officers testified that Mr. Impson's gun had not been fired.) Defendant testified that he had not been drinking that day, and that he found the bottle of whiskey that the officers found near him in Mr. Impson's car, after the shooting. He denied shooting Mrs. Impson, grabbing her by the hair, or touching her. He stated that he won the gun he used in a pool game in Pawhuska, and the party gave him a box of one hundred shells. He did not remember being placed in the Bokchito jail, and did not remember being taken from there to Durant, where he was when he awoke, and did not know how long he had been there.

This is the gist of the testimony. The defendant was represented by two members of the Durant bar, appointed by the court, and they made a valiant effort to protect the defendant's rights at every stage of

the trial. They filed a brief in this Court, and orally argued the case here.

 Defendant sets out seven assignments of error. The first is that the verdict is not sustained by the evidence, because of the confused and deranged condition of the mind of the defendant at the time of the homicide, and quotes Dr. Engle's answer to the hypothetical question in support thereof. He cites no authority.

Our Penal Code, 21 Okl.St.Ann. § 152, provides:

"All persons are capable of committing crimes, except those belonging to the following classes: * * * Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness."

Upon this provision the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has the mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act. Alberty v. State, 10 Okl.Cr. 616, 140 P. 1025, 52 L.R.A.,N.S., 248; Roe v. State, 17 Okl.Cr. 587, 191 P. 1048. And where one is being tried for murder, and his defense is insanity, lunacy or unsoundness of mind at the time of committing the act, the defendant, in the first instance is presumed to be sane and of sound mind, and the burden is upon him to introduce sufficient evidence to raise a reasonable doubt as to his sanity. Kennamer v. State, 59 Okl. Cr. 146, 57 P.2d 646. Hence the hypothetical question referred to was admissible, and was in the nature of expert testimony as the opinion of Dr. Engles. Of course, such opinion might be accepted or rejected by the jury. The law makes no distinction in weighing the evidence between expert testimony and evidence of other character. It is for the jury and not the reviewing court to determine the weight to be given such evidence. See also Dare v. State, Okl.Cr., 378 P.2d 339; Carter v. State, Okl.Cr., 376 P.2d 351; Bingham v. State, 82 Okl.Cr. 5, 165 P.2d 646; Pierce v. State, Okl.Cr., 371 P.2d 924; and Wallen v. State, Okl.Cr., 338 P.2d 170.

In Smith v. State, 12 Okl.Cr. 307, 155 P. 699, wherein the defendant was charged with murder, the only defense attempted or suggested on behalf of the defendant was insanity, or such weakness or derangement of mind as to render him irresponsible in law for the commission of the homicide. In that case a physician testified that it was his opinion that the defendant was temporarily insane at the time he fired the fatal shots. Defendant was convicted of manslaughter in the first degree and sentenced to thirty years imprisonment, and the case was affirmed.

It is our opinion that the verdict was fully sustained by the evidence.

Defendant's second and third propositions are argued together, and being that the verdict is contrary to law, and "errors of the court in conducting the voir dire examination of prospective jurors which were objected to by the defendant and exceptions allowed."

Defendant states that "It is the thinking of the defendant that these two specifications of error deal with and cover substantially the same principles in that the active part taken by the court in the voir dire examinations of prospective jurors was clearly against the substantial rights of the defendant."

The voir dire examination of the jurors in this case is set out in full in the casemade, and covers 197 pages. Defendant concedes that "the court has the right and occasionally should ask a prospective juror a clarifying question, but it is believed that when the court in a capital case takes over the voir dire examination the wishes and repeated objections of defendant and his attorneys that reversible error is committed."

 After careful consideration, we do not feel that the trial court "took over" the

voir dire examination in this case. The court did ask each juror what might be called a set of standard questions, about as follows: Are you acquainted with the defendant Jose Gonzales; were you acquainted with Denny Impson or any one of the Impson family; are you acquainted with any of the attorneys in this case on either side; have you read of this case in the newspapers, or heard it on the radio or television; have you ever had any discussion of this case with any person or persons who purported to know the facts in this case; from what you have read in the newspapers or heard on the radio or television have you formed or expressed any opinion concerning the guilt or innocence of the defendant; and you have no opinion at this time; in other words, you would be willing to take the evidence as you hear it from the witness stand and the court's instructions, and just on those two things alone render a fair and impartial verdict in this case; and you would be willing to do that?

However, the court in no wise and at no time limited the defendant in his interrogation of the prospective jurors, and did not eliminate any part of counsel's voir dire under the claim that the court had already covered the same.

Defendant specifically complains of the examination of seven of the prospective jurors, but none of them served on the jury in this case. Two of them were challenged by the defendant, and five were excused by the court. There is no showing in this record that any of the jurors who sat upon the trial of this cause were in any respect disqualified or in any manner prejudiced against defendant or his cause of action. Nowhere in the record did the trial court refuse to sustain the defendant's challenges for cause, and in most instances, where there was the slightest doubt the trial court excused the prospective juror without challenge. Defendant waived his eighth peremptory challenge and then the ninth and stated, "We accept the jury."

██ In Young v. State, Okl.Cr., 357 P.2d 562, this Court said:

"Presumption exists, in absence of contrary showing, that jury is composed of impartial and qualified jurors, and defendant who waives his ninth (9th.) peremptory challenge can not be heard to complain that he did not obtain a competent jury."

██ In Vardeman v. State, 54 Okl.Cr. 329, 20 P.2d 194, the Court said:

"The manner and extent of examination of jurors, touching their qualifications, cannot be prescribed by any definite, unyielding rule, but rests to a large extent in the sound discretion of the trial judge. In the examination, such latitude should be given the parties as will enable them to procure a jury free from outside influence, bias, or personal interest."

And see also Jones v. State, 20 Okl.Cr. 154, 201 P. 664; Roddy v. State, 47 Okl.Cr. 283, 287 P. 765.

In support of his contention defendant first cites Tegeler v. State, 9 Okl.Cr. 138, 130 P. 1164, in which Judge Furman wrote an excellent opinion concerning the questions there involved; and defendant then cites Douglas v. State, 19 Okl.Cr. 257, 199 P. 927, and Elkins v. State, 29 Okl.Cr. 175, 233 P. 491.

In Tegeler v. State, supra, the trial court overruled defendant's challenges to a number of the jurors. Herein none of defendant's challenges were overruled, and defendant waived the last two of his challenges. In the Tegeler case the Court said:

"It will be seen from an examination of this section of our statute [22 Okl. St.Ann. 662] that any juror who has formed or expressed an opinion from any source whatever upon the matter or cause to be submitted to him is prima facie disqualified, *unless it appear to the court that such juror can and will, notwithstanding such opinion, act impartially and fairly upon the matter to be submitted to him.*" (Emphasis now supplied.)

And in the body of the opinion, quoting from Turner v. State, 4 Okl.Cr. 164, 111 P. 988, it is said:

"Under the statute, an opinion formed or expressed as to the guilt or innocence of the defendant founded upon rumor or newspaper reports does not disqualify a juror, provided it appears to the court, upon the declaration of said juror, he can and will, notwithstanding such opinion, act impartially and fairly upon the law and evidence. As we construe the statute, the competency of a juror is a question of fact to be determined by the court in the exercise of a sound discretion and constitutes a legislative definition of the constitutional provision; however, it cannot be regarded as changing in any degree the essential qualifications which jurors must possess. It merely furnishes a test by which those qualifications are to be determined. It makes the declaration of the juror, 'that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him, competent, as bearing upon the question of his impartiality, and requires the court to consider such declaration, when so made.' The statute does not attempt to determine what shall be the probative force of the declaration of the juror, or how far it shall have the effect of relieving him on the disqualification arising from such an opinion. The declaration when so made is evidence to be received and given such weight as, under all circumstances appearing, it is fairly and justly entitled to. Before it can operate to remove the disqualification, the court must be satisfied of its truth, and that question is left to be determined from all facts and circumstances appearing from his examination upon the voir dire."

The Douglas case, wherein the defendant was charged with raping a fourteen year old girl, was reversed, the court stating,

"There can be no doubt that the defendant was prejudiced by the trial court's *examination of the prosecutrix,* and that such examination constituted an abuse of discretion by the trial court and was in effect a comment on the weight of the evidence.

 In Elkins v. State, supra, the defendant was convicted of murder and the judgment and sentence affirmed. The Court there said:

"A mere partial opinion or impression does not disqualify, if it be apparent that such partial opinion or impression will not influence the juror in finding a verdict. Inasmuch as the trial court has a wide discretion in passing on the competency of jurors, we think there was no abuse of discretion in overruling the challenge for cause to the Juror Schunaman."

We conclude that defendant's second and third propositions must fail.

Defendant's fourth contention is error of the court in admitting evidence and testimony to which the defendant objected and exceptions allowed. Defendant cites no case in support of this proposition.

 It has repeatedly been held that before this Court can reverse a conviction upon the ground that the trial court erred in the admission or rejection of evidence, or its instructions to the jury, it must first find from an inspection of the entire record that appellant was injured thereby, and to determine the question of appellant's guilt or innocence of the offense charged. Bowers v. State, 56 Okl.Cr. 111, 34 P.2d 292; Miller v. State, 94 Okl.Cr. 297, 235 P.2d 552; Henderson v. State, Okl.Cr., 385 P.2d 930, and cases cited.

After a careful examination of the record, and the exceptions taken to the rulings of the court on the admission and rejection of testimony, we are satisfied that, within well settled rules sustained and upheld by the decisions of this Court, no material error was committed by the court in any of its rulings.

Defendant's fifth proposition is that the court erred in overruling defendant's demurrer, and defendant's demurrer at the close of the state's testimony.

We have searched the record and do not find that the defendant filed a demurrer to the information. We have, however, carefully read and considered the same, and find it sufficient. As to the demurrer at the close of the State's testimony, we fail to find that the trial court erred in overruling the same.

 Defendant sets out as his sixth assignment of record, "Error of the court in limiting final argument of defense counsel", and cites Middleton v. State, 16 Okl.Cr. 320, 183 P. 626 in support of this proposition.

From the record before us it appears that this trial lasted two days, and at 4:15 p. m. on the second day the court reconvened, and read his instructions to the jury. The special prosecutor and one of the attorneys for the defendant made their arguments. Mr. Gossett, the other attorney for defendant, announced that it was then 12 minutes of six o'clock and he objected to having to make his closing argument at that late hour, and stated that he felt it was an imposition on him, and not fair to his client to be forced to continue the argument at that time. The court overruled this request, and closing arguments were completed, and the case given to the jury. The jury was permitted to retire, and return its verdict the next afternoon.

This was a matter within the discretion of the trial court, and we do not feel that the court abused its discretion in the matter. We agree with the Attorney General where he states: "Our strongest point in this discussion is Mr. Gossett's closing argument itself. This, we submit, is as fine and able an argument as defendant could desire, with the evidence of his guilt being so convincing."

Finally, defendant complains of error of the court in overruling defendant's motion for new trial. Finding no fundamental error in the record, the trial court was justified in overruling the motion for new trial.

For the reasons herein set forth, the judgment and sentence of the district court of Bryan County is affirmed.

BUSSEY and NIX, JJ., concur.