Pittman F. TIMS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–289.

Court of Criminal Appeals of Oklahoma.

July 22, 1974.

As Corrected July 24, 1974.

Rehearing Denied Aug. 16, 1974.

John E. Shipp, Idabel, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Patrick Kernan, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Pittman F. Tims, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, McCurtain County, Case No. CRF–73–127, for the offense of Murder in the Second Degree; his punishment was fixed at an indeterminate term of not less than ten (10) years nor more than life imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial Diane Beam, wife of the deceased Billy Eugene Beam, testified that she and her husband had gone to the Curve Tavern near Wright City, Oklahoma, at approximately 8:00 p. m., on August 25, 1973, to visit the proprietress, Mrs. Virgie Cunningham, the mother of Mrs. Beam.

Mrs. Beam testified that when she and her husband first arrived at the bar they took their three small children into the living room quarters behind the tavern and left them there to watch television while she and Mr. Beam went to the front of the bar to visit with friends for the next

several hours. At approximately 11:00 p. m. the defendant had come to the booth where the Beams were seated with a friend, Clark Brown. Brown introduced them and after exchanging pleasantries, the defendant left their booth and returned to the bar where he was drinking beer. A few minutes after midnight the couple rose from the booth and were walking across the tavern floor to the backroom to collect their children when Mrs. Beam heard a scream. She further testified she heard the barmaid shout at her husband, and when she turned around to look at him the defendant was stabbing him with a long butcher-like knife. She testified that the deceased ran backward from the defendant trying to ward off the attack but that he fell several feet away near a pool table in the center of the tavern floor. On both direct and cross-examination Mrs. Beam said that neither she nor her husband had seen the defendant before the night of the stabbing. She further stated that prior to the incident there had been no altercation or exchange of words whatsoever except the friendly introduction approximately an hour before the attack.

Sandra Jean Mitchell, the tavern employee who was tending bar on the night of the stabbing, stated that she had never seen the defendant before August 25, but had been introduced to him earlier in the evening. She said that she saw the defendant walk over to the Beams' booth and speak to Clark Brown, but he had returned to the bar after a short time and since then had been attempting to talk with another man who had apparently fallen asleep at the bar. Miss Mitchell further testified that as the Beam couple was walking toward the bar going toward the backroom she saw the defendant rushing toward Billy Beam brandishing a knife. She stated that she screamed, Beam turned around to face the defendant, and that the defendant stabbed him. Following the stabbing, she said she saw the defendant carrying a serrated edged long-bladed knife in one hand and a small blade pocket knife in the other. She further testified that she had been at the tavern working all evening and that there had been no arguments or any kind of trouble either between the defendant and the deceased or anyone.

Mrs. Diane Beam's sister, Betty Jo Carter, who was also at the tavern on the night of the stabbing testified that she and her boyfriend had just left the bar and were sitting in a car outside the open door of the tavern when they saw what appeared to be a fight, so they went back inside. She said that she did not see the defendant strike the deceased but she did see him rising from deceased's body and that he had two knives in his hands. Mrs. Carter said she walked over to the defendant and started gently pushing him on the chest, backing him out the door. She said that the defendant offered no resistance and said nothing. A few minutes later, after realizing the seriousness of the wounds, the witness said she went outside to the parking lot where the defendant was still standing beside his car and told him that he would pay for what he had done. Mrs. Carter also testified that she was unaware of any disturbance having occurred prior to the stabbing.

Eddie Walker, boyfriend of Mrs. Carter, testified to substantially the same facts as Mrs. Carter, explaining that he did not see any actual stabbing, although he did see the defendant carrying a large knife.

Witness Clark Brown testified that he arrived at the Curve Tavern at approximately 10:30 p. m., played several games of pool with the deceased, and was sitting with the deceased and his wife in a booth when he first saw the defendant. Brown said that the deceased asked him if knew the man pacing back and forth in front of the bar. Brown said he walked over to the man, recognized him as the defendant, a co-worker, and shortly thereafter introduced the defendant to the Beam couple. After being introduced, Brown testified that the defendant left the booth and returned to the bar. About 30 minutes later, the deceased told Mr. Brown it was time for his wife and him to go home. As they were walking to the back of the tavern, the

stabbing occurred. Brown said that the introduction had been very friendly and that after the defendant had met the Beams there was no further discussion about him whatsoever.

According to the testimony of R. C. Gassaway, he and the defendant had first gone out to drink beer at approximately 7:00 p. m. on August 25. He said they had already been to two beer joints near Valliant when they arrived at the Curve Tavern at 8:00 p. m., staying there for two beers and then leaving. Gassaway testified that they then went to two more taverns in the Broken Bow area drinking more beer before returning to the Curve Tavern sometime later. Gassaway said he was not sure he saw what happened in the fight, although he did see the defendant carrying a knife. He testified that after the fight he and the defendant drove back to their homes in Ft. Towson.

The final testimony was given by Dr. L. L. Duncan, pathologist from Texarkana, Texas, who conducted an autopsy on the deceased on August 27, 1973. Dr. Duncan testified that he discovered six separate stab wounds, the fatal one being a six inch gash in the left chest cavity.

Thereafter, the State rested.

The defendant did not testify or offer any evidence in his own behalf.

In his first proposition of error, the defendant alleges that he was denied a fair trial or due process of law through the failure of the court to appoint a private psychiatrist to examine him. He bases this contention on the fact that although there is no statute empowering the court to provide private psychiatric examination of indigents, in this instance the defendant was denied a fair trial because of a lack of expert examination.

An issue identical to the one raised by the defendant in his first proposition was dealt with by this Court in Stidham v. State, Okl.Cr., 507 P.2d 1312 (1973). In that case the defendant, after being observed at Central State Hospital and declared legally sane, then moved that the court appoint a psychiatrist for his exclusive benefit because, as an indigent, due process under the Sixth and Fourteenth Amendments required such action. His motion was overruled and that action was upheld by this Court. In deciding the issue the Court looked to United States ex rel. Smith v. Baldi, 344 U.S. 561, 97 L.Ed. 549, 73 S.Ct. 391 (1953), where it was held that the State does not have a constitutional duty to provide private psychiatric examination to indigents.

Since there is no statutory provision for the furnishing of private psychiatric advice, and in light of the authority holding that it is not required, we accordingly find the defendant's first proposition to be without merit.

In his final proposition, the defendant contends that the trial court erred in not impaneling a jury for a sanity hearing in accordance with the provisions of 22 O.S.1971, § 1162 which provides:

"When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the fact."

It must be noted that the defendant, at the request of his attorney, had been placed under psychiatric observation at Eastern State Hospital for 60 days. As a result of that observation the court was notified by Dr. R. D. Garcia, chief of Forensic Medicine at the hospital that:

"We have completed our examination of this patient and wish to return him to your jurisdiction. The staff is of the opinion that he is not psychotic at this time. He is able to distinguish between right and wrong, and we feel he would be able to adequately assist legal counsel in his own behalf." (page 7 of the record)

This Court in Johnson v. State, Okl.Cr., 448 P.2d 266 (1969), said in the syllabus by

the Court that it is not error for the trial judge to deny a jury hearing as to sanity when the court has received medical certification from a State Hospital doctor that the defendant is sane according to law in absence of overwhelming evidence to the contrary.

The defendant maintains that "a doubt" as to his sanity as provided for in 22 O.S. 1971, § 1162 had arisen, and he supports this allegation with comments made by the trial court in the order denying his motion to have a private psychiatric examination. In pertinent part the order read:

" . . . this Court finds that there are reasonable grounds to believe that the defendant, Pittman F. Tims, was at the time of the acts complained of legally insane . . . . " (page 20 of the record)

A careful reading of the trial court's order shows that whatever doubt there was concerning the sanity of the defendant was related to his sanity at the time of the act, not at the time of trial. In Baker v. State, Okl.Cr., 433 P.2d 525 (1967), this Court, quoting from Laslovich v. State, Okl.Cr., 377 P.2d 977 (1963), said in reference to the aforementioned Section of 22 O.S.:

"It is also apparent, under the statute quoted, that the defendant's rights may be protected either at the commencement of the trial or before the entry of judgment and sentence. In either case, *the defendant's right to a jury trial is predicated upon the trial judge's doubt as to the issue of present sanity.*"

The record in the instant case shows that although the defendant entered a plea in the alternative of not guilty and not guilty by reason of insanity, no testimony was taken at trial concerning the issue although the jury was instructed on both pleas. It should be also noted that no request was made for a hearing on the defendant's sanity during the course of the trial.

In Bingham v. State, 82 Okl.Cr. 5, 165 P.2d 646 (1946), this Court said in the syllabus:

"Where counsel for defendant interposes defense of insanity at time of commission of crime, which issue is properly submitted to the jury, trial court did not have duty to submit to a separate jury the question as to defendant's present sanity, in the absence of any request made on behalf of the accused for such a hearing and in the absence of substantial testimony or other evidence which was sufficient to raise a doubt in the Court's mind as to present sanity of accused." (paragraph 13)

In the instant case no testimony was given on behalf of the defendant whatsoever, and the only mention of his alleged insanity was made by his counsel in trying to obtain a private psychiatric examination. Based on the above, considering the fact that the defendant was observed at his own request at Eastern State Hospital where he was found to be legally sane, and in view of the fact that no evidence was introduced at trial to indicate that the defendant was not presently sane, the trial court was correct in not impaneling a jury to consider the question of defendant's sanity in the past. In O'Dell v. State, Okl.Cr., 455 P.2d 750 (1969), this Court answered in relation thereto that the question of sanity at the time of the offense is a question of fact for the jury.

Accordingly, for all the reasons above recited, we find the defendant's propositions of error to be without merit and the judgment and sentence appealed from herein is, affirmed.

BLISS, P. J., and BRETT, J., concur.