John W. CARTER, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13143.

Court of Criminal Appeals of Oklahoma.

Nov. 14, 1962.

Chris Rhodes (Public Defender), Tulsa.
for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

The plaintiff in error, John W. Carter, defendant below, was charged by information in the district court of Tulsa County, Oklahoma with the crime of first degree manslaughter, allegedly committed on March 28, 1960, at about 11:45 a. m. in said county and state. It was charged that the accused drove his automobile on the left-hand side of the highway into the front end of a tractor and pole-trailer loaded with pipe and weighing 24000 pounds, whereby the defendant's mother, a passenger in the front seat of defendant's automobile, sustained injuries from which she died as the result of the collision.

It was further alleged that the defendant was feloniously operating his automobile at the time of the collision under the influence of intoxicating liquor (47 O.S.1951 § 93), and while so engaged he crossed over the center median in a no-passing zone (47 O.S.1951 § 121.4) into the path of the oncoming heavily loaded truck.

The case was tried to a jury, the defendant convicted, and his punishment was fixed at four years in the penitentiary. Judgment and sentence was entered accordingly, from which this appeal has been perfected.

The facts in support of this conviction, offered by the state, were as will be briefly hereinafter set forth.

It appears that the mother of the defendant, Lucy Lena Carter, obtained a permanent wave in the beauty shop of Mrs. Jerry Lee Vantrease, in Sand Springs, Tulsa County, Oklahoma, on March 28, 1960. The operation was concluded between 11:30 and 12 o'clock noon. During this time the defendant appeared at the beauty shop, ostensibly to take his mother home.

Mrs. Vantrease testified that when the defendant came into the shop he was red-faced, didn't look well, and staggered, but that she was not close enough to him to smell his breath. She further testified that he asked her for a drink of water and followed her into the kitchen to get it. He offered Mrs. Vantrease a drink of gin, which she declined, and he then took a drink himself from a partially filled bottle, which he put back under his belt. Mrs. Vantrease said she thought the defendant was under the influence of alcohol, and was a little drunk. She testified that shortly after the defendant and his mother left, the collision occurred about half a mile east of her home. She testified that she went to the scene of the accident and the defendant's car was on the left side of the road, headed east, the direction defendant was travelling when he left her home. (On cross examination of this witness, defense counsel brought out that on the day and at the time in question, defendant was, in her opinion, too drunk to operate his automobile.)

On re-direct examination this witness testified that defendant's speech was like that of a man who had been drinking, and it was her opinion that he was drunk.

The truck driver, Roley Lee Dill, testified that the collision between defendant's car and his truck occurred just east and outside the city limits of Sand Springs on the date in question. He related he was travelling west on the right-hand side of the road, and the defendant was travelling east on the Wekiwa Road headed towards Tulsa. Suddenly the defendant swerved to the left as though turning into a driveway, then switched straight up the road towards the pipe-loaded truck, with the resulting terrific head-on collision, resulting in Mrs. Carter's death.

The testimony of the officers who investigated the crime was that the defendant had the bottle of gin in his belt and a strong alcoholic breath when he was found in the wreckage with his mother.

The weather, the officers and others testified, was a dry, "sunshiny" day. The record shows the defendant was driving at about 40 miles an hour in a no-passing zone, when the collision occurred.

Both the defendant and his mother were unconscious when removed from the wreckage. Mrs. Carter was practically scalped, sustained severe head injuries, injuries to her chest, and both legs were broken, and she was pronounced dead on arrival at the hospital.

This is substantially the evidence upon which the state convicted the defendant.

The defendant testified in his own behalf to the effect that in the year 1959 he was in an auto-train collision in which he sustained, among other injuries, a severe head injury. For such injuries it appears he was treated at the veterans' hospital in Muskogee, Oklahoma, during a period of several months and by several doctors, among whom was Dr. Mark Adams.

The court sustained an objection to an attempt to establish dizzy spells as a result of that injury; and also sustained an objection to questions relative to defendant being confined in the State Hospital at Vinita subsequent to the March 28, 1960 collision, such objection being sustained on the ground of immateriality.

The defendant testified on both direct and cross examination that he had no recollection of the alleged drinking episode, and the collision that followed. He only faintly remembered that he had arranged for Mrs. Vantrease to fix his mother's hair, but he recalled nothing subsequent thereto.

The defendant then offered Dr. Mark Adams, staff physician at the Veterans' Hospital in Muskogee, Oklahoma. He was qualified as an expert in physical medicine, and rehabilitation. He testified that he treated the defendant John Carter in the Veterans' Hospital from September 14, 1959 to February 10, 1960. He did not treat him for his injuries received in the truck collision of March 28, 1960, though defendant was in the Veterans' Hospital for awhile thereafter. Objection was made to the doctor testifying, and the introduction of hospital records, concerning defendant's head injury, for which he was treated before March 28, 1960, and as to

any causal connection between that injury and the collision resulting in his mother's death. The objection was sustained.

It is apparent that an attempt was being made to establish a condition of blackout at the time of the collision of March 28, 1960. The trial court permitted a tender by Mr. Rhodes, the public defender, of evidence and medical conclusions by Dr. Adams, if he were permitted to testify. The proffered testimony, in substance and condensed as far as proper presentment of the question will permit, was as follows:

That if Mark Adams, duly qualified and practicing doctor at the Veterans' Administration Hospital were called to testify, he would testify in substance that the defendant had been a patient of his in the hospital as the result of injuries sustained when the defendant was in an auto-train collision in which his car was struck by a train, while he was crossing the railroad intersection, that he was thrown from his car, his clothing hooked by the train and Carter was dragged by the train several hundred yards before the train was stopped. As a result thereof tests, x-rays and examinations revealed the defendant to have sustained cerebral concussion, severe, due to a subarachnoid hemorrhage due to trauma. The defendant was observed and further examined until February 10, 1960; that as a result of that examination and observation he was found to have a large and continued gap of memory for events during September and October and was unable to relate any of the details of the accident which had occurred in September. That defendant suffered loss of equilibrium, impairment of judgment, and spells of dizziness, which related directly to the cerebral concussion sustained in the September 13 auto-train collision. That defendant at the time of the accident in September, 1959 was 32 years of age, and had a prior history of being in good health.

It then appears that if the trial court had permitted Dr. Adams to be hypothetically questioned with an assumption of the foregoing facts and the additional facts that

on March 28, 1960 this subject was involved in a head-on auto-truck accident, which occurred when defendant was driving his car and had made an apparent attempt to turn left into a private driveway and at the last minute turned back to the right, running head on into the opposite bound tractor trailer loaded with pipe. Assuming all of those facts to be true, based on reasonable medical certainty and from a medical and clinical point of view as to whether there might be or could be a causal connection between the injuries received in the auto-train accident and the auto-truck accident on March 28, 1960 that the doctor's answer would have been, "Yes, I do have an opinion." That there might be and could be a connection between the injuries received in former accident, in that when he was released February 10, 1960 just 48 days before the subsequent accident, he had a condition of chronic brain syndrome due to trauma and that he was at that time experiencing dizzy spells, impairment of judgment, impairment of equilibrium, and was subject to blackouts.

The county attorney objected to this offer of proof, the objection was sustained and the offer denied, and the defendant allowed an exception.

This proffered evidence speaks for itself.

Thereafter Mr. Don J. Dickinson, a clinical psychologist, was qualified as having a bachelor of science degree, and as a master of science professional psychologist, but not a psychiatrist, at the Eastern Oklahoma State Hospital, practicing his profession and with publication of articles written by him. His treatment and evaluation of many cases, in our opinion, qualified him as an expert in his field of psychology.

He was asked if he had occasion to examine defendant Carter over long periods of time. Objection was interposed and sustained, on the ground the plea of insanity had not been interposed, and that Mr. Dickinson was not qualified to testify to the conclusions sought to be established. Counsel for defendant stated that the plea was

not insanity but one of behavioral condition.

Then out of the hearing of the jury, a tender of Mr. Dickinson's testimony was offered by Mr. Rhodes in condensed substance as follows:

That if Don Dickinson, psychologist at Eastern State Hospital at Vinita were called to testify, he would testify that defendant herein had been admitted and treated in the State Hospital for a mental disorder, convulsions and chronic brain syndrome, for approximately eight months, beginning in August, 1960 and that during that time at the State Hospital he was observed, examined and tested; that a complete history was obtained of defendant in connection with a train accident which occurred September 13, 1959 and a subsequent auto-truck accident which occurred March 28, 1960, and that the diagnosis of the Veterans' Hospital of chronic brain syndrome, which was given upon release from the Veterans Hospital after treatment for injury sustained in the September 13, 1959 accident had continued and carried through up to and following the March 28 accident. That it was found his behavioral symptoms were consistent with chronic brain syndrome involving complete memory loss as to any of the details of the September 13 and March 28 accident; dizzy spells, loss of equilibrium and impairment of judgment, all of which were symptomatic of chronic brain syndrome, etc. That the defendant's mental condition on diagnosis is apparently his chronic brain syndrome growing out of the auto-train accident of September 13, and the auto-truck accident of March 28. That he still had chronic brain syndrome, memory loss, loss of equilibrium; was still experiencing dizzy spells, and was possibly subject to blackouts.

That if a hypothetical question were posed to the psychologist Dickinson, with facts similarly enumerated to those propounded in the hypothetical question to Dr. Adams, he would be of the opinion that there could be a causal connection between the two accidents, based on the chronic . brain syn-

drome and the mental confusion and disorientation, dizzy spells, loss of equilibrium, and impairment of judgment which resulted from the September 13 auto-train accident.

Here it was further objected that this witness was not medically trained and therefore was not competent to give the answer called for. This objection was sustained.

On the issues thus made the case must be determined.

It herein appears that the defense sought to be established was that of a history of dizziness, loss of equilibrium, and blackouts as a result of the prior injury sustained in the train-auto collision on September 13, 1959, and that the defendant may have been under the spell of such condition at the time of the collision of March 28, 1960, and not conscious.

The defense thus sought to be interposed was rejected over objections and exceptions, and instructions covering same were denied.

The requested instructions read as follows:

"1) You are hereby instructed that before you can return a verdict of guilty you must find from the evidence beyond a reasonable doubt that at the time of the accident upon which this charge is brought, either the defendant consciously and intentionally drove his car across the center-line of Wekiwa Road without an intention to make a lawful left turn or that defendant was under the influence of intoxicating liquor as heretofore defined." [Refused and defendant excepts.]

"2) You are further instructed that in determining the question of defendant's guilt, you may consider the testimony of the doctor and psychologist who testified on defendant's behalf as to his past medical history of brain injury and resultant amnesia and periodic attacks of dizziness, loss of equilibrium and perception and possible blackouts and such present continued condition, and if from the evidence there remains in your mind a reasonable doubt that

defendant was at the time of the accident suffering from dizziness, loss of equilibrium and perception or a blackout, which impaired his judgment or caused him to lose control of his car, you must return a verdict of not guilty." [Refused and defendant excepts.]

The issues are defined in the defendant's brief ably presented by the public defender. He sets them forth thusly:

"The State's contention was that defendant was intoxicated as he drove east on Wekiwa Road and that because of his intoxicated condition he veered off course to the left side of the road where the collision took place and that defendant was therefore guilty of both driving while intoxicated and driving on the left and hence guilty of manslaughter first degree in the resulting death of his mother.

"The defendant denied that he was intoxicated and that he intentionally or knowingly drove his car to the left side of the road and into the oncoming 'rig'. But if this was so—why did he stagger when he came into the house of Mrs. Vantrease a few minutes before the accident? Why did he appear ill? Why did his car weave on the road prior to the accident? Why did he drive or allow his car to move to the opposite lane of travel, with a heavily loaded tractor-trailer coming on? And if to make a turn why did his judgment fail him when he probably could have made the turn, and [what] caused him to turn back and directly into this head-on collision?

"There was one reason for all of this so far as defendant's defense was concerned, and it was the 'reason' that defendant was entitled to have before the jury to properly determine the guilt or innocence of this defendant—that defendant was still actively suffering the effects of a 'cerebral concussion, severe' which manifested itself in the defendant by 'headaches, dizziness, loss of memory, marked loss of equilibrium,

impairment of judgment and blackouts.'

"The defendant had a case history throughout his treatment by the Veterans Administration Hospital following the September, 1959 accident of denying ever having any of these troubles, even though they could be proven and were proven by medical testing to still exist in February, 1960, upon defendant's release to the custody of his mother just forty-eight days prior to the accident herein. It was Dr. Adams' opinion that these symptoms still existed on the day of this accident.

"Even if defendant had been able to testify to all of this himself it would have been necessary to at least have had the testimony of Dr. Adams to substantiate the same. It was not conjecture or speculation that these same symptoms existed on the day of the accident herein—these were continuing symptoms which were ever present throughout the day, marked periodically by the more severe effects of extreme dizziness and blackouts.

"The evidence was relevant and material in that it was aimed directly at the substantial issue of the case, to-wit: whether defendant was intoxicated.

"With the exception of Mrs. Vantrease's opinion which itself was based upon circumstantial conclusions on her part, the state's proof of the defendant's alleged intoxication was based upon circumstantial evidence. We therefore believe the offered testimony of Dr. Adams was probative and that part of Mr. Dickinson's testimony relating to defendant's continued loss of memory for the events surrounding the accident herein were probative."

Counsel cites in support of this argument McCormick's Evidence, § 152, p. 315, reading as follows:

"In the court room the terms 'relevancy' and 'materiality' are often used interchangeably but 'materiality' in its more precise meaning looks to the relation between the propositions for which the evidence is offered and the issues of the case. If the evidence is offered to prove a proposition which is not a matter in issue nor probative of a matter in issue, the evidence is properly said to be immaterial.

"We start, then, with the notion of materiality, the inclusion of certain questions or propositions within the range of allowable controversy in the lawsuit. Relevancy in legal usage embraces this test and something more. Relevancy is the tendency of evidence to establish a proposition which it is offered to prove."

In 22 C.J. p. 65, "Material Evidence" is defined as follows:

"Evidence offered, or a question propounded is material when it is relevant and goes to the substantial matters in dispute, or has a legitimate and effective influence or bearing on the decision of the case." See also 31 C.J.S. Evidence § 159.

■ See also McLaurin v. State, 34 Okl.Cr. 324, 246 P. 669, wherein the late Judge Doyle said:

"In a criminal prosecution, any legal evidence from which the jury may adduce guilt or innocence is admissible if, when taken with other evidence in the case, its relevancy appears, and the rejection of competent testimony offered by defendant constitutes prejudicial error."

Quoted with approval in Fahay v. State, Okl.Cr., 288 P.2d 757.

The materiality and relevancy of the testimony of Dr. Adams together with his conclusions is made most apparent in light of the provisions of 21 O.S.1951 § 152, reading in part as follows:

"All persons are capable of committing crimes, except those belonging to the following classes: * * *

"6. Persons who committed the act charged without being conscious thereof. * * *"

In 22 C.J.S. Criminal Law § 55, p. 194, the rule construing such statutes as our 21 O.S.1951 § 152, subsec. 6, is stated as follows:

"Unconsciousness. A person cannot be held criminally responsible for acts committed while he is unconscious. Some statutes broadly exempt from responsibility persons who commit offenses' without being conscious thereof. Such statutes, when construed in connection with other statutes relating to criminal capacity of the insane and voluntarily intoxicated, do not include within their protection either insane or voluntarily intoxicated persons, and are restricted in their contemplation to persons of sound mind suffering from some other agency rendering them unconscious of their acts * * *."

■ It should be noted that it has been clearly pointed out that a defense of insanity and defense of unconsciousness are not the same, either by statutory definition or by interpretation of the courts. People v. Martin, 87 Cal.App.2d 581, 197 P.2d 379; People v. Taylor, 31 Cal.App.2d 723, 88 P. 2d 942.

■ Though it is now definitely established under statutes similar to ours that "if a person is unconscious at the time he commits a crime, he cannot be held responsible" (Smith v. Commonwealth, Ky., 268 S.W.2d 937; Corder v. Commonwealth, Ky., 278 S.W.2d 77), nevertheless where a motorist drives an automobile, knowing he is subject to frequent blackouts, such operation of the automobile would constitute unlawful disregard of the safety of others, and would amount to culpable or criminal negligence, by reason of the doing of such act in reckless disregard of its possible results. Such act would be covered under our Title 21 O.S.1951 § 716 on second degree manslaughter.

■ These situations all are within the framework of the evidence sought to be introduced herein, and should have been submitted to the jury under proper instructions.

■ On a retrial of this case, the jury should be instructed upon every issue presented within the ambit of the pleadings and the proof. First, it should be instructed upon the state's theory of first degree manslaughter (21 O.S.1951 § 711) by reason of the commission of a misdemeanor, drunken driving, resulting in the homicide.

Second, the court should also instruct on the defense theories that the defendant denied he was intoxicated.

Third, it should instruct on the theory that the defendant contends he was the victim of a blackout and was unconscious. See Smith v. Commonwealth, supra, for an example of an instruction covering a similar situation.

Fourth, the jury should also be instructed on the theory that one knowing he was subject to such blackouts or spells of unconsciousness, nevertheless drove his automobile, thus he might be held guilty of second degree manslaughter by reason of culpable or criminal negligence by reason of his reckless disregard of the possible results of such act.

Fifth, the jury should also be instructed that under the testimony of Roley Lee Dill, driver of the truck, by reason of defendant's reckless disregard for the safety of others in pulling his automobile to the left of the center of the highway in a vain effort to make a left-hand turn into a driveway, directly into the path of the on-coming truck, the defendant might be found guilty of the included offense of second degree manslaughter by reason of culpable negligence in the fact he failed to do that which a reasonably prudent person would do.

Sixth, the jury should be instructed on the included offense of negligent homicide by reason of reckless disregard of the safety of others, (47 O.S.1951 § 11–903) in the operation of his automobile.

Crossett v. State, 96 Okl.Cr. 209, 252 P. 2d 150, holds:

"It is the duty of the court to instruct the jury from both the stand-

point of the state and the defendant; and the defendant had the right to have a clear affirmative charge based upon the hypothesis that his testimony and the testimony of his witnesses was true, when this testimony affects a material issue in the case.

"If the instructions submitted appear to the court not to be in proper form, or fully or correctly state the issues, still, if the instructions submitted are sufficient to call the court's attention to the material issues raised and which has a basis of support in the evidence, it is the duty of the court to prepare and give a proper instruction on the issue thus presented to the court.

"The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury have been properly instructed as to the law of the case; and where the instructions do not fully present all the material issues raised, the judgment of conviction will be set aside."

■ In not admitting Dr. Adams' testimony the defendant was left stripped of his defense. It was a matter that should have been submitted to the jury under the foregoing statute, as provided by law. It was a matter concerning what was contended to be a vital and existing condition having material bearing on the issue involved. It would not eliminate the state's theory that the death of Mrs. Carter was the result of defendant's intoxication. If believed by the jury, we are of the opinion that the evidence was ample to support the verdict. Nevertheless, by reason of the rejection of the evidence in support of the defendant's theory that he was unconscious, and instructions in support thereof, the defense theory never got to the jury, and defendant was denied his day in court. The tendered testimony of Dr. Adams was not only material but relevant to the defense herein interposed, and we are of the opinion that in face of the provisions of 21 O.S.1951 § 152, subsec. 6,

it was fundamental error to reject the testimony in relation to the asserted blackouts.

So, also, the testimony of Mr. Dickinson was admissible as that of an expert psychologist. In McKee v. State, Okl.Cr., 372 P.2d 243, we held:

"The state of mind of the accused is the proper subject for expert testimony when the defense is based on a plea of insanity at the time of commission of the act, but it is not a proper subject for expert testimony when the defense is not based on a plea of insanity at the time of commission of the act for which the defendant stands accused."

The application of this rule is available as pointed out only under the provisions of 21 O.S.1951 § 152, subsec. 4, covering lunatics and insane persons temporarily or partially deprived of reason. There was no such plea in the McKee case as herein interposed, and hence the evidence of Dr. Ungerman, psychologist, was not relevant to the plea of self-defense, and an instruction in that regard would have been error.

■ Herein the defendant's plea and defense was not insanity, but under the provisions of 21 O.S.1951 § 152, subsec. 6, to the effect the defendant was not conscious of the act complained of and resulting in his mother's death, or that it was by reason of a mental blackout. The testimony of the psychologist, though not to be received as medical proof, was proper as expert psychological evidence.

As was said in Watson v. State, 161 Tex. Cr.R. 5, 273 S.W.2d 879:

"A practicing psychologist who had had considerable training and experience in analyzing motivation for human conduct should be classified as an expert upon mental illness."

■ We do not adopt this rule "in toto". The testimony of a psychologist, because of his training in evaluation of his observations, may rise to a higher level than that

of a layman untrained in the study of human behavior. The testimony of a psychologist may not reach that level of a trained doctor of medicine, or of a psychiatrist. He is not a medical expert on mental illness. Nevertheless, a psychologist is competent to testify concerning an expert evaluation of behavior patterns, based upon his training, observation and experience. Thus he may arrive at a conclusion as to whether certain behavioral conduct, such as recurrent dizziness, loss of memory, loss of equilibrium and blackouts could or might be existent as a part of the behavioral conduct of an individual at a given time, under certain conditions, in light of the psychologist's observations and study of the person's conduct. However, the testimony of any expert should be accorded only such weight and credence as the jury may believe it is entitled to receive under the existing circumstances and conditions concerning which the testimony is offered. Bingham v. State, 82 Okl.Cr. 5, 165 P.2d 646; Pierce v. State, Okl.Cr., 371 P.2d 924.

And in State v. Askin, 90 Mont. 394, 3 P.2d 654, it was held:

"To give medical opinion evidence, witness need not be physician and surgeon if he possesses necessary experiential qualifications. * * *

"Mere fact that witness was physician and surgeon, without evidence of actual experience in, or study of, subject under consideration, held insufficient to qualify him as expert."

And see also Bryant v. State, 159 Tex. Cr.R. 98, 261 S.W.2d 728, in which it was held that a witness who had a master's degree and one year's work on a doctor's degree in chemistry, two and a half years experience as a chemist and toxicologist for the Department of Public Safety, and experience in making tests and observing reactions of subjects having different percentages of alcohol in their blood, was qualified to testify that a person having a specified percentage of alcohol in his blood would be intoxicated.

Both the testimony of Dr. Adams and Mr. Dickinson was in our opinion material, relevant and admissible under the statute for the defense herein interposed. It was a mental illness not amounting to insanity, if such was true, and may have rendered the accused unconscious and unaccountable for his conduct. The credence to be accorded the proof was one for the determination of the jury, which it was denied by the trial court's ruling on the evidence and the requested instructions 1 and 2, and this was reversible.

Another question raised as to the trial court's failure to further instruct is not supported by the record made, there being no submission of or request for additional instructions. Thus the objections, not being properly preserved is not now before us for discussion. Chapman v. State, 84 Okl.Cr. 41, 178 P.2d 638; Storer v. State, 84 Okl.Cr. 176, 180 P.2d 202.

The judgment and sentence herein is accordingly reversed and remanded with directions to proceed in a manner not inconsistent herewith.

NIX, P. J., and BUSSEY, J., concur.