## COMMONWEALTH vs. JAMES MONICO

Essex.   December 3, 1985. — February 20, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & NOLAN, JJ.

*Insanity. Practice, Criminal,* Instructions to jury. *Witness,* Expert, Psychologist. *Evidence,* Expert opinion, Insanity, Relevancy and materiality, Other offense. *Self-Defense.*

At the trial of a murder case at which there was evidence that the defendant had a history of head injuries and that shortly before he shot the two victims the defendant had suffered an injury to his head, and at which there was expert testimony respecting the defendant's head injuries, the effects of such injuries, and tests revealing some dysfunction of the defendant's brain, the judge's refusal to instruct the jury on the defense of insanity constituted reversible error. [797-803]

An expert witness without a medical degree may give an opinion on criminal responsibility if he is otherwise qualified to do so based on his training and experience. [803-806]

At the trial of a murder case, there was no error in the judge's refusal to instruct the jury that a shod foot could be considered a dangerous weapon giving rise to self-defense, where the judge correctly instructed the jury on self-defense and further instructed the jury on the use of excessive force as reducing the crime of murder in the first degree to manslaughter. [806-807]

At the retrial of a defendant charged with murdering two persons by shooting them, evidence that after the defendant's arrest a folding buck knife was found in his possession during a custodial search at a police station should not be admitted. [807]

At the retrial of a defendant charged with murdering two persons by shooting them, evidence that the defendant was displaying a knife with a six-inch blade shortly before the shootings may be admitted as probative of the defendant's state of mind at the time in question. [807]

INDICTMENTS found and returned in the Superior Court Department on January 5, 1982.

The cases were tried before *Andrew R. Linscott,* J.

*Bruce N. Sachar* (*Vincent R. Brogna* with him) for the defendant.

*Robert J. Bender,* Assistant District Attorney *(Thomas M. Niarchos,* Assistant District Attorney, with him) for the Commonwealth.

NOLAN, J. On April 14, 1983, the defendant was convicted of murder in the first degree of James Mortellite and of murder in the second degree of Jeffrey Connors. We accept the defendant's argument that the trial judge committed reversible error in refusing to instruct the jury on the issue of the defendant's criminal responsibility in accordance with *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967). We address those issues that may recur at the new trial.

On December 24, 1981, the defendant, a security guard for the Wells Fargo Company, went target shooting with a friend and later attended a Christmas party. At the party, he temporarily placed his gun and holster in a tool box. The defendant and another friend went shopping and then to that friend's house, where the defendant placed his gun in a closet. At approximately 8 P.M., he retrieved the gun and left. Before leaving, the defendant telephoned his wife and asked her to make sure that the children did not go to bed before he arrived home, and stated that he would be home shortly.

That evening, at the White Eagle Cafe, the defendant was seen asking various women to dance and was said to be "pest[ering]" them. The defendant was also observed "outstar[ing]" people. There were complaints to the bartender about the defendant, and she requested that the defendant leave.

A witness, Theodore Sullivan, who was present at the bar from approximately 9 A.M. on December 24, and who had been "sipping" beer throughout the day, observed the defendant standing with a knife in his hand. The blade of the knife was six to seven inches long. Sullivan knocked the knife out of the defendant's hand, retrieved the knife, and put it in his belt. The defendant was not observed making threatening gestures with the knife. Sullivan subsequently brought the knife home, misplaced it, and was unable to produce the knife at trial. The defendant never asked the witness to return his knife.

The defendant left the bar at one point and returned approximately forty-five minutes later. Again, he began "bothering"

a woman, Sandra Stevens, who was in the company of the two victims.

At that point, one of the victims, James Mortellite, pushed the defendant against a wall, causing the defendant's head to strike a wall lamp, breaking the globe and bending the metal frame. The defendant then walked toward the exit door of the bar, turned to the victims and said, "If you're coming, come on."[1] Other patrons told the defendant to close the door. The defendant left the bar followed by the two victims.

Several witnesses reported their observations of the events outside the café. The defendant, facing the two victims, was backing down[2] the street alongside the café, and the three men were exchanging words. The victims, clad in T-shirts and jeans, were not carrying anything, although they were approaching the defendant and forcing him to back away. At some point the defendant pulled out his gun. One witness testified at trial that the defendant shouted, "Keep away — I have a gun and I'll shoot," and then one of the victims, who was taller than the defendant, aimed a karate-type kick toward the defendant's head. The defendant then fired a "warning" shot at the ground. A second witness testified that the warning shot came prior to the kick. After the first shot was fired, the two victims rushed the defendant. The defendant fired two more shots; one victim fell to the ground, and the other continued to brawl with the defendant. At that point in time, the defendant's back was close to a fence next to the club. Both victims died from the bullet wounds.

The police arrived on the scene shortly thereafter and observed the defendant standing with a gun in his hand. He stated to the police, "Here's the gun. I shot him. Here's the gun."

---

[1] The bartender did not tell the police that the defendant had made this statement. Another witness, Sandra Stevens, who testified about this statement, had previously told the police that the defendant had said something but that she did not know what he had said. In fact Stevens had previously stated to the police that the defendant was "chased" out because he would not close the door. At trial, she claimed to have no recollection of this statement.

[2] One witness had testified that the defendant turned around and looked startled.

The defendant was advised of his Miranda rights, and he indicated that he understood those rights. He appeared to be "very coherent," was bleeding slightly from his face and the back of his head, and had a mildly bloody nose. The defendant asked the police, "Did I kill him?" He was placed in custody, and enroute to the police station and for approximately forty-five minutes thereafter, the defendant made the following rambling statements to the police. He stated, (1) that "[h]e came after me, so I shot him. He went to his side for a gun, so I wasn't going to wait, so I blew him away"; (2) that a man came after him with "[h]is fist" and "[l]ook at my face"; (3) that he went to the café to have sex and that he had $15.00; (4) that the fight started because "[t]hey came down on me"; (5) that "[h]e came down on me; said — Monico, you're an [ ], you've got to leave"; (6) that "[h]e came at me with a handgun. I think his name is Richie Gaudet. [3] All of a sudden he attacked me for no reason. He was drunk. I thought he had a gun; it was a small revolver, a .32, maybe; [or a] Saturday night special." The defendant also told the police that he saw Gaudet pull a gun, so he "went for [his] automatic." The defendant stated that Gaudet threw a beer bottle at him from across the bar, pointed a gun at the defendant and ordered him outside, and that "[h]e came up with a [ ] gun, and I started blasting. Did I kill him or what? I hope the [ ] I did." He also stated to the police, "I wanted to kill the mother[ ], and put that in the report." The defendant also made reference to "niggers" who "attacked" him. Police officers testified that they observed no black persons at the scene. Also, the defendant mentioned that the persons who had attacked him were "Hell's Angels." He also claimed to have been assaulted by persons with baseball bats. No baseball bats were found in the area, although members of the group called "Hell's Angels" were seen present at the bar that night.

The defendant's father was called by the Lynn police, and when he arrived at the station, the defendant told him that "they" hit him from the back with a bat, "they were jumping

---

[3] It was later established that neither victim was named Richard Gaudet.

[him]," and that "they had a gun." The defendant asked his father where he was. He then stated that the police had caused his injuries. On the way home (after being bailed), the defendant refused his father's advice that he go to a hospital for treatment, and stated that he had to go to work the next day. The following day was Christmas Day. The father testified that at the police station cuts beside and under his son's left eye were bleeding and that he had a cut under his chin; there was blood in the defendant's mouth and a large laceration on the back of his head.

The police testified that the defendant did not seem to realize that there was a second victim of the shooting. He did not mention the karate kick or his warning shot to the ground.[4]

A friend of the defendant visited him three days after the shooting at the White Eagle Cafe, and observed that the defendant's lip was "bulged out," that he had a cut below and above his left eye, a gash on the back of his head, blood clotted in his hair, and discoloration around his left eye. The defendant had no memory of the night of the shooting except for his presence at the café, and he had a vague remembrance of a fight, and of his lawyer's presence at the police station. The defendant complained that his head hurt, and his friend observed that the defendant was "kind of spaced out [and] disoriented."

Three witnesses testified for the defendant in support of his insanity defense: Dr. Edwin B. Faulkner, a general practitioner, who examined the defendant on December 28, 1981, Dr. Roy Freeman, a neurologist, and Paul Spiers, a clinical neuropsychologist. Their testimony is set forth in detail as the issues are discussed in this opinion.

1. *Instructions on criminal responsibility under Commonwealth v. McHoul.* The defendant filed a request that the judge charge the jury on insanity. The request was denied, and the defendant argues on appeal that the evidence was sufficient to

---

[4] Investigation revealed that there were four "spent" cartridge casings on the ground and one live projectile. No inquiry was ever made into how many shots were actually fired. The defendant's gun was capable of holding five cartridges.

raise a question of the defendant's criminal responsibility. We agree. In *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967), we set forth the standard for measuring a defendant's criminal responsibility. "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Id.* at 546-547. Expert psychiatric testimony is not necessary to raise the issue of insanity as a complete defense. *Osborne* v. *Commonwealth,* 378 Mass. 104, 112 (1979). The issue may arise from the facts of the case, through the Commonwealth's witnesses, through lay testimony, or any combination thereof. *Commonwealth* v. *Mattson,* 377 Mass. 638, 644 (1979). "An insanity defense may be raised properly by the admission of any evidence which, if believed, might create a reasonable doubt concerning the defendant's criminal responsibility at the time of the [crime]." *Commonwealth* v. *Laliberty,* 373 Mass. 238, 246-247 (1977). We have noted that, once the defense has been raised by the evidence, the judge must instruct on it, if requested to do so. *Id.* at 244. The issue then is whether the evidence is sufficient to warrant a *McHoul* charge. See *Commonwealth* v. *McInerney,* 373 Mass. 136, 151-152 (1977).

The following testimony was presented to the jury which, taken as a whole, required an instruction under *Commonwealth* v. *McHoul, supra.* Dr. Faulkner, who examined the defendant three days after the shootings, testified that the defendant was experiencing pain in the left side of his head, nausea, double vision, and dizziness. The defendant had a blood clot in his left eye and two lacerations to the left parietal area of the skull just behind the ear. Dr. Faulkner also stated that the defendant suffered a concussion on the evening of December 24, and that his injuries were caused by "being struck or striking" a blunt instrument. The doctor described the state of mind of one who has a concussion as not realizing one's present situation.

Dr. Freeman, a neurologist, one who specializes in diseases of the brain, defined a concussion as a "sudden impairment in

the neural or brain function due to a mechanical injury." A person who has suffered a concussion experiences confusion, amnesia, lethargy, and an inability to maintain a coherent stream of thought. He stated that a concussion might cause one to behave abnormally, such as by acting abusively, violently, or irritably, and to confabulate (fabricate stories). He also stated that every concussion results in some alteration of consciousness whether it be seconds or hours.

Dr. Freeman testified about the defendant's past medical history. In 1978, the defendant had been in an automobile accident during which his head hit the windshield and the defendant lost consciousness for some duration of time.

In 1979, the defendant fell from the top of a truck, and remained unconscious for an uncertain span of time. He also suffered some memory loss, hearing loss, and a right temporal laceration. X-rays of his skull showed that he had also sustained a fracture to the left parietal area of his skull. When conscious, the defendant experienced disorientation and loss of memory.[5]

Dr. Freeman testified that a "coup" injury, which is most likely what the defendant suffered in his 1978 car accident, affects the frontal lobe area of the brain and may affect one's state of arousal, control of impulses, and ability to reason and exercise good judgment. He also testified that the defendant had residual damage from his prior accidents at the time of his examination.

Dr. Freeman examined the defendant six months after the shootings. The result of an EEG (test measuring electrical activity of the brain) was abnormal, and tests revealed some dysfunction of the defendant's brain. Dr. Freeman described a dysfunction as a "particular function that is related to the area or parts of the body not being carried out appropriately or correctly." When asked by defense counsel whether a person in a state of concussion would be suffering from a mental

---

[5] The defendant's friend testified that after the fall from the truck, the defendant was unable to carry on a conversation, that he exhibited slurred speech and difficulty hearing in the right ear. One month later the defendant appeared to be "back to normal."

defect or reduced capacity and be unable to conform his be-
havior to usual social standards, Dr. Freeman responded that
the statements made by the defendant to the police were con-
sistent with those that might be made by one with a concussion
or with a frontal lobe dysfunction. He also stated that a person
who had been concussed or was suffering from frontal lobe
dysfunction could have an impairment in judgment, and could
commit impulsive or violent acts even though such acts nor-
mally would be against that person's nature.

Dr. Freeman preferred to categorize the defendant's head
injuries as constituting a "frontal lobe dysfunction" rather than
as a "disease." He did state that "[a] state of concussion may
be considered a mental defect temporarily." The doctor was
not able to answer with certainty a question by defense counsel
fashioned in language from *McHoul* because he had not
examined the defendant on the night of the shootings. He did
testify, however, "I think that it's likely that he suffered a
concussion injury [a]nd in those terms, I think that it's possible
that he was incapable of conforming his behavior to the require-
ments of law."

The testimony of Dr. Freeman alone was sufficient to warrant
an instruction on insanity under *McHoul*. See *Commonwealth
v. Mattson, supra* at 644. An expert witness is not required
to fashion an answer to the exact language in *McHoul* in order
to justify an instruction,[6] nor is the element of absolute certainty
required. See *Commonwealth* v. *Shelley,* 381 Mass. 340, 348
n.4 (1980). But see *Commonwealth* v. *Trapp, ante* 202, 212
n.9 (1985) (medical opinion based on "possibilities" inadmis-
sible).

Moreover, the facts of this case, quite apart from any expert
testimony, demand an insanity instruction. See *Blaisdell* v.
*Commonwealth,* 372 Mass. 753, 765 (1977). The defendant
appeared to be acting normally until the time of the shootings.
He was not acting aggressively toward patrons in the bar, with

---

[6] We note that if reference is made to a standard it must be framed in
terms of *McHoul,* and furthermore, an opinion to be admissible must be
based on more than a possibility. See *Commonwealth* v. *Amaral,* 389 Mass.
184, 193 (1983).

the exception of "pest[ering]" women and possibly "out-star[ing]" a few people. Police officers testified that he was not intoxicated that evening, nor was there evidence that he was disoriented or confused prior to the shooting. Although the defendant was carrying a gun, he never displayed it or pointed it at anyone prior to the confrontation outside of the café. Sullivan, who confiscated the defendant's knife, testified that the defendant was not brandishing the knife in a threatening manner. It was only after his head was shoved against the lamp that his behavior appeared to change drastically. This evidence, along with the evidence of the defendant's history of head injuries, could create an inference of mental disease or defect. See *Blaisdell, supra.*

Finally, Spiers' testimony further enhanced the necessity for a *McHoul* charge. He reviewed the defendant's prior medical records and the police reports and examined the defendant upon the referral of Dr. Freeman. He conducted a series of tests measuring the defendant's perceptual, verbal and perform-ance intelligence, and conceputal ability. He testified that, "in summary, the neuro-psychological examination suggested that there was evidence of residual frontal lobe dysfunction on both sides of the brain and some left temporal lobe dysfunction." His interpretation of the same EEG's discussed in Dr. Freeman's testimony was that the defendant had "some subtle abnormalities bi-frontally," which were consistent with the dysfunction that he had found on the defendant's neuro-psychological examination. Spiers also stated that the defend-ant's statements to the police subsequent to the shooting, and his behavior at the time of the shooting, were consistent with the acts and statements of someone with a dysfunction in the brain, "which is . . . of the kind typically seen in a concussion [and which can cause] confusion, amnesia, confabulation and complex acts, and yet a lack of awareness for those acts."

The judge would not allow Spiers to state whether any of his tests indicated the existence of a "mental disease" or "de-fect." Spiers did comment, however, that his tests do not de-termine the existence of "mental illness" but are aimed at determining whether there is "brain dysfunction." In reference

to the defendant's two prior head injuries, Spiers commented that "[w]hen someone sustains injury to the brain, [the brain] tends to attempt to compensate for that injury so that we continue to function normally. If there are repeated injuries to the brain, then those compensations become more costly." Based on the information that Spiers gathered from the results of his testing, it was his opinion that "[the defendant's] behavior at the time of the shooting, given that you have informed me that he was probably not severely intoxicated . . . and given that he was not severely intoxicated, then the behavior he exhibited at that time is consistent with [a] dysfunction in the brain, which is [a] dysfunction of the kind typically seen in a concussion with confusion, amnesia, confabulation and complex acts, and yet a lack of awareness for those acts." Furthermore, Spiers testified that the testing that he performed revealed results that were "not inconsistent with the possibility that his amnesia was due to brain injury." However, at the time of the testing, there was no evidence that the defendant had a limited or abnormally diminished capacity which would prevent him from foreseeing the consequences of his act. Although Spiers' tests were not designed "to reveal [the defendant's] capacity to reason and judge at the time of the incident," we rule, nevertheless, that Spiers' testimony was relevant, competent evidence on the issue of the defendant's criminal responsibility, and provided a sufficient basis for an instruction. Moreover, as we later rule in this opinion, Spiers should have been allowed to render a *McHoul* opinion, and thus his testimony may have been more probative on the issue of insanity.

We reverse the convictions because of the judge's failure to charge the jury under *Commonwealth* v. *McHoul, supra.* "Where the appropriateness of an insanity instruction is marginal, the better choice would seem to be to err on the side of giving it, since the Commonwealth has the ultimate burden of proving the defendant sane beyond a reasonable doubt, and the jury are 'the sole judge[s] of this factual issue.'" *Commonwealth* v. *Mattson,* 377 Mass. 638, 644 (1979), quoting *Commonwealth* v. *Smith,* 357 Mass. 168, 180 (1970). Here, the appropriateness of the insanity instruction was more than mar-

ginal. Its absence constituted a deprivation of a defense to which the defendant was entitled.[7]

2. *Exclusion of Spiers' opinion testimony.* The defendant next contends that it was reversible error to exclude Spiers' opinion testimony under *Commonwealth* v. *McHoul, supra,* on the ground that Spiers was not a physician.[8] We agree with this contention. In this Commonwealth, a lay witness is precluded from giving an opinion on a person's sanity or insanity although that witness can testify to facts observed.[9] See *Commonwealth* v. *Schulze,* 389 Mass. 735, 739-740 (1983). See generally P.J. Liacos, Massachusetts Evidence 117 (5th ed. 1981). We have also held that a general practitioner (with a medical degree but without a specialty in psychiatry), who examines a criminal defendant, may testify as to his observations, his diagnosis and prescribed treatment of the defendant's mental condition, but he may not render an opinion on the issue of criminal responsibility if he is not specially qualified in the treatment of mental diseases. *Schulze, supra.* We did not hold in *Schulze,* however, that in order to be "specially

---

[7] We recognize that the judge gave an instruction under *Commonwealth* v. *Gould,* 380 Mass. 672, 680-683 (1980), but we think that it was not enough under the circumstances.

[8] The Commonwealth argues that the judge did not limit his reasons for excluding Spiers' testimony to the fact that Spiers was not a physician, but that the judge ruled in general that Spiers was not a qualified expert to render a *McHoul* opinion. We disagree. It is obvious from the record that Spiers' credentials would render him a qualified expert in the subject area in issue, although we are careful not to invade the discretion of the trial judge in making this determination. It is also clear from the judge's statement that "[t]his man is not a physician, with all due respect to his training and the work he does . . . .," that the judge was not going to allow the witness to give his opinion under any circumstances despite his credentials.

[9] We note, as we have in the past, that our stringent rule runs contrary to Fed. R. Evid. 701 and Rule 701 of the Proposed Mass. R. Evid. as well as to the rules in many jurisdictions. See *Commonwealth* v. *Schulze,* 389 Mass. 735, 739 n.2 (1983). Generally, in these jurisdictions any witness may state an opinion if it is rationally based on that witness' perception and is helpful to the over-all determination of the issue of criminal responsibility. *Id.*

qualified," the expert witness must possess a medical degree.[10] Accord *Old Colony Trust Co.* v. *DiCola,* 233 Mass. 119, 125 (1919) (mere fact that witness is a physician does not render one an expert in mental disease). As we set forth in *Commonwealth* v. *Schulze, supra* at 738, "in order to give an opinion on criminal responsibility, a physician must be more qualified in the treatment of mental diseases and defects than a general practitioner, although he need not be a specialist in psychiatry." See *Commonwealth* v. *Boyd,* 367 Mass. 169, 181-183 (1975).

A person may qualify as an expert capable of rendering an opinion on criminal responsibility without being a psychiatrist. He may be, as here, a psychologist. "The critical factor is the [witness's] actual experience and the probable probative value of his testimony." *United States* v. *Green,* 373 F. Supp. 149, 158 (E.D. Pa.), aff'd, 505 F.2d 731 (3d Cir. 1974), cert. denied, 420 U.S. 978 (1975), citing *Jenkins* v. *United States,* 307 F.2d 637, 646 (D.C. Cir. 1961). "[T]raining and other factors, rather than academic degrees, are important in determining the admissibility of a psychologist's testimony about sanity." *Id.,* citing *Jenkins* at 650 (Burger, J., concurring).

In the present case, Spiers was eminently qualified in the field of neurological dysfunctions.[11] He was a clinical neuro-

---

[10] Other jurisdictions support this ruling. See *People* v. *Pennington,* 66 Cal. 2d 508, 519 (1967). See generally Annot., 78 A.L.R.2d 919 (1961 & Later Case Serv. 1975). See also *Carter* v. *State,* 376 P.2d 351, 359 (Okla. Crim. App. 1962) (although plea was not insanity but defendant claimed lack of culpability because of "blackout," psychologist without medical degree qualified as expert on behavior patterns). But see *People* v. *Gilliam,* 16 Ill. App. 3d 659, 663-664 (1974). Cf. *Smith* v. *State,* 141 Ga. App. 720, 722 (1977) (B. A. in psychology plus eleven months' experience, no abuse of discretion in not qualifying witness as an expert).

[11] Spiers testified that his job is to "differentiate on the basis of psychological testing, on the basis of psychological interviews, and . . . of other information available to [him], [and to determine] whether or not the problems the patient may be having in [his] behavior [are] related to some neurological condition." He further commented that the field of neuropsychology parallels psychiatry without the medical training, and that it is a recent specialty within the field of psychology. Spiers works primarily with patients who have brain damage as opposed to a neurosis which requires therapy or other forms of psychological treatment. His main interest is in behavioral changes when the brain functioning has been temporarily disrupted.

psychology consultant at Beth Israel Hospital. His under-
graduate training was in abnormal psychology at McGill Uni-
versity in Montreal and he completed his training in clinical
psychology with a specialization in clinical neuropsychology
at Clark University. He trained at Boston's Veterans' Admin-
istration hospital in the neurobehavior unit and conducted re-
search at the University of Paris. Spiers holds a master's degree
in clinical psychology and was submitting his dissertation in
psychology to obtain his doctorate. He had examined over one
hundred head injuries in the course of his training, and was
then currently teaching neurology at Harvard Medical School.

As we previously stated, Spiers was not allowed to render
an opinion[12] under *McHoul,* nor was he allowed to answer the
question whether any of the tests indicated that the defendant
was suffering from a mental disease, or that a concussion was
a mental defect.[13] We note that the defendant failed to object
to the exclusion of Spiers' testimony and did not make an offer
of proof. However, because we are reversing the convictions
on another ground, we need not decide whether there was a
substantial risk of a miscarriage of justice which would require
a new trial. See *Commonwealth* v. *Henson,* 394 Mass. 584,
590 n.3 (1985). On balance the judge erred, in light of Spiers'
qualifications and his extensive testing of the defendant, in
excluding Spiers' testimony on the basis that he did not have
a medical degree. The exclusion is understandable because we
had not yet spoken to the question of the admissibility of an
opinion from such an expert. The inclusion of Spiers' opinion
under *Commonwealth* v. *McHoul, supra,* however, might have
significantly affected the jury's conclusion on the issue of

---

[12] We note that Spiers' testimony would be admissible only if he were
able to render an opinion about the defendant's behavior on December 24,
1981. *Commonwealth* v. *Sheehan,* 376 Mass. 765, 771 (1978). Spiers
examined the defendant at least six months after the shootings.

[13] Spiers stated that his testing does not determine the presence of "mental
illness" per se but is aimed at seeing if there is a brain dysfunction. He
commented that the presence of mental illness is something that doctors
decide or diagnose.

criminal responsibility. Spiers' testimony, as set forth earlier in this opinion, reinforced the testimony of Drs. Faulkner and Freeman, and his opinion could have created a reasonable doubt.

3. *Refusal of instruction on shod foot.* The defendant's assertion that the judge committed reversible error in refusing to charge that a shod foot could be considered a dangerous weapon giving rise to self-defense is without merit.

In assessing the sufficiency of jury instructions, we consider the charge in its entirety "to determine the 'probable impact, appraised realistically . . . upon the jury's factfinding function.' " *Commonwealth* v. *Richards,* 384 Mass. 396, 399-400 (1981), quoting *United States* v. *Wharton,* 433 F.2d 451, 457 (D.C. Cir. 1970). We have examined the charge and hold that the judge correctly instructed the jury on the use of self-defense. The judge further charged on the use of excessive force as reducing the crime of murder in the first degree to manslaughter. Cf. *Commonwealth* v. *Burbank,* 388 Mass. 789, 795 (1983).

We think that the charge more than adequately covered the substance of self-defense. A judge is not required to grant a particular instruction so long as "he cover[s] adequately the substance of the requested instructions." *Commonwealth* v. *Lowe,* 391 Mass. 97, 109, cert. denied, 469 U.S. 840 (1984). Here, the judge was not compelled to single out and emphasize the fact that a shod foot may be considered a dangerous weapon. See *Commonwealth* v. *Weaver,* 395 Mass. 307, 313 (1985). "Having given the jury correct rules for their guidance . . . [the judge] is not required to go further and discuss possible findings of fact upon which a defendant might be acquitted." *Commonwealth* v. *Greenberg,* 339 Mass. 557, 585 (1959). The jury, taking into consideration life's experiences, could have inferred that a karate-type kick by one wearing "work" boots could produce serious bodily harm to another, or at least instill in a reasonable person the fear of the possibility of grave bodily harm. Moreover, defense counsel argued extensively the issue of self-defense in his closing.[14] We, therefore, think

---

[14] The defendant's father, a former police officer, testified that he has witnessed several assaults committed with a "shod foot."

no error was committed in the refusal of an instruction regarding a shod foot.

4. *Introduction of evidence of defendant's possession of knives.* We have repeatedly stated that evidence of specific acts of prior misconduct may not be introduced in an attempt to show that the defendant has a bad character or a propensity to commit crimes. See, e.g., *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 755 (1961); *Commonwealth* v. *Bohannon,* 376 Mass. 90, 93 (1978). See generally P.J. Liacos, *supra* at 146-150. However, evidence of prior bad acts may be relevant for some other purpose, such as to show state of mind, bias, or motive on the part of the defendant or of a witness. See *Commonwealth* v. *Cheek,* 374 Mass. 613, 615 (1978).

In the present case, the defendant challenges the introduction of evidence that a witness at the White Eagle Cafe knocked a knife with a six-inch blade out of the defendant's hand, and also that a folding buck knife was found in the defendant's possession during a custodial search at the police station.

There was no evidence indicating that the second knife was more than a mere pocket jackknife, or that the defendant was charged with illegal possession of a dangerous weapon. The evidence of this knife had slight probative value on the issue of the defendant's state of mind, and should be excluded at the new trial because of its possible prejudicial effect on the jury.

On the other hand, the testimony that the defendant was displaying a knife at the bar was probative of the defendant's over-all state of mind on the night of the shootings as tending to show that he was the aggressor. "The prosecution was entitled to present as full a picture as possible of the events surrounding the incident itself." *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269-270 (1982). Here, the judge did not err in balancing the probative value of the knife against its prejudicial impact on the jury. See *Commonwealth* v. *Jackson,* 388 Mass. 98, 103-104 (1983). Cf. *Commonwealth* v. *Banuchi,* 335 Mass. 649, 654 (1957).

*Judgments reversed.*

*Verdicts set aside.*